**TRANSCANADA PIPELINES LIMITED, et al., Petitioners,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent.**

**No. 87–1229, et al.**

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 13, 1989.

Decided June 16, 1989.

---

Paul W. Fox, with whom Steven H. Neinast (for ProGas Ltd.), Harold Talisman and John T. Ketcham (for Tennessee Gas Pipeline Co.), Paul H. Keck and Robert I. White (for TransCanada PipeLines Ltd.), Daniel F. Collins, Washington, D.C., and Terry O. Brackett, Lombard, Ill., (for ANR Pipeline Co.), Paul E. Goldstein, Paul W. Mallory, Lombard, Ill., Emmitt C. House, Chicago, Ill., and Georgetta J. Baker (for Natural Gas Pipeline Co. of America), John T. Ketcham· (for Northwest Pipeline Corp.), George W. McHenry, Jr., and John H. Burnes, Jr., Washington, D.C., (for Westcoast Energy, Inc.) were on the joint brief, for Aligned petitioners TransCanada PipeLines Ltd., et al., in Nos. 87–1229, 87–1230, 87–1283, 87–1296, 87–1297, 87–1318, 87–1322, 87–1353, 87–1362, 87–1364, 87–1632, 87–1637, 87–1822, and 88–1018.

Dwight C. Alpern, Detroit, Mich., Atty., Federal Energy Regulatory Commission ("FERC"), with whom Catherine C. Cook, Gen. Counsel, and Jerome M. Feit, Washington, D.C., Sol., FERC, were on the brief, for respondent. Joshua Z. Rokach and Hanford O'Hara, Washington, D.C., Attys., FERC, also entered appearances for respondent.

John M. Cutler, Jr., with whom William I. Harkaway and Douglas M. Canter, Washington, D.C., were on the brief, for Southwest Gas Corp., petitioner in Nos. 87–1295, 87–1621, and 88–1318, and intervenor in Nos. 87–1362, 87–1364, 87–1621, 87–1632, and 87–1637.

John R. Schaefgen, Jr., (for Central Illinois Light Co.), Robert C. Platt (for Independent Petroleum Ass'n of America, et al.), Jeffrey M. Petrash and James H. Holt (for Michigan Consolidated Gas Co.), Richard M. Merriman and Stephen L. Huntoon (for Michigan Gas Utilites Co.), David I. Bloom (for Northern Illinois Gas Co.), Thomas M. Patrick and Karen Lee (for The Peoples Gas Light and Coke Co., et al.), Washington, D.C., Robert A. MacDonnell, Philadelphia, Pa., (for Philadelphia Electric Co.), and Richard A. Solomon, New York City, and David D'Allessandro, Pittsburgh, Pa., (for the Public Service Comm'n of the State of New York) were on the joint brief for intervenors in Nos. 87–1229, 87–1230, 87–1283, 87–1318, 87–1822, and 88–1018.

Robert C. Platt was also on the brief for amici curiae Independent Petroleum Ass'n of America, et al., urging reversal.

Nancy A. White entered an appearance for TransCanada PipeLines Ltd., petitioner in No. 87–1229 and intervenor in Nos. 87–1283 and 87–1318.

Bernard A. Foster III, Washington, D.C., entered an appearance for ANR Pipeline Co., petitioner in Nos. 87–1318 and 87–1822 and intervenor in Nos. 87–1229, 87–1230, and 87–1283.

Robert H. Benna, Washington, D.C., and Ernest B. Abbott entered appearances for Tennessee Gas Pipeline Co., petitioner in No. 87–1353 and intervenor in Nos. 87–1229 and 87–1318.

Dale A. Wright, James T. McManus, David D. Withnell, Washington, D.C., Stephen K. Schroeder, Salt Lake City, Utah, Terence J. Collins, and Vera Callahan Deinast, Washington, D.C., entered appearances for Northwest Pipeline Corp., Tennesee Gas Pipeline Co., and Midwestern Gas Transmission Co.

Richard M. Merriman, Washington, D.C., also entered an appearance for Central Illinois Light Co., intervenor in Nos. 87–1229, 87–1230, 87–1283, 87–1318, and 87–1822.

Jane E. Stelck entered an appearance for Canadian Petroleum Ass'n, et. al., intervenors in Nos. 87–1229 and 87–1230.

Karyl M. Arnold, Lombard, Ill., entered an appearance for Natural Gas Pipeline Co. of America, intervenor in Nos. 87–1229 and 87–1230.

Jon L. Brunenkant, Washington, D.C., and Gary M. Prescott, entered appearances for Mesa Operating Limited Partnership, intervenor in No. 87–1229.

John H. Burnes, Jr., and George W. McHenry, Jr., Washington, D.C., entered appearances for Westcoast Transmission Co., Ltd., intervenor in Nos. 87–1229, 87–1230, 87–1295, 87–1362, 87–1632, and 88–1318.

Daniel F. Collins, Washington, D.C., Donald C. Shepler, Salt Lake City, Utah, and Katherine L. Henry entered appearances for Colorado Interstate Gas Co., intervenor in Nos. 87–1295, 87–1362, 87–1364, 87–1621, 87– 1632, 87–1637, and 88–1318.

John T. Ketcham, Joseph O. Fryxell, and Ted P. Gerarden, Washington, D.C., entered appearances for Cascade Natural Gas Corp., intervenor in Nos. 87–1295, 87–1362, 87–1364, 87–1621, 87–1632, and 87–1637.

Ana Colon Aebi entered an appearance for intervenor Public Service Commission of Nevada in No. 87–1295.

Thomas F. Brosnan and Andrea J. Ercolano, Washington, D.C., entered appearances for Washington Natural Gas Co., intervenor in Nos. 87–1295, 87–1362, 87–1632, and 88–1318.

Donald K. Dankner, Washington, D.C., entered an appearance for CP National Corp., intervenor in Nos. 87–1295, 87–1621, 87–1632, 87–1637, and 88–1318.

J. Richard Tiano and Mary Ann Walker, Boston, Mass., entered appearances for Intermountain Gas Co., intervenor in Nos. 87–1295, 87–1362, 87–1364, and 87–1621.

Gary G. Sackett, Salt Lake City, Utah, entered an appearance for Mountain Fuel Resources, Inc., and Questar Pipeline Co., intervenors in Nos. 87–1295, 87–1362, 87–1364, 87–1632, 87–1637, and 88–1318.

Robert A. Nelson, Jr., Portland, Ore., entered an appearance for Northwest Natural Gas Co., intervenor in Nos. 87–1295, 87–1362, 87–1364, 87–1621, 87–1632, and 87–1637.

Shawn P. Leyden, Trenton, N.J., entered an appearance for Public Service Electric & Gas Co., intervenor in No. 87–1296.

Judy M. Johnson entered an appearance for Texas Eastern Transmission Corp., intervenor in Nos. 87–1296, 87–1297, and 88–1018.

Frank P. Saponaro, Jr., and Mary E. Baluss, Washington, D.C., entered appearances for Philadelphia Gas Works, intervenor in Nos. 87–1296 and 87–1297.

John W. Glendening, Jr., and Bruce B. Glendening, Washington, D.C., entered appearances for Berkshire Gas Co., et al., intervenors in No. 87–1353.

Bruce F. Kiely and Mark C. Schroeder, Washington, D.C., entered appearances for City Gas Co., et al., intervenors in No. 87–1822.

Stanley W. Balis and Demetrios G. Pulas, Jr., Washington, D.C., entered appearances for Municipal Defense Group, intervenor in No. 88–1018.

Nicholas W. Mattia, Jr., Roseland, N.J., entered an appearance for New Jersey Natural Gas Co., intervenor in No. 88–1018.

Before MIKVA and RUTH BADER GINSBURG, Circuit Judges, and HOGAN,* District Judge.

Opinion for the court filed by Circuit Judge MIKVA.

MIKVA, Circuit Judge:

These sixteen consolidated petitions for review of decisions of the Federal Energy Regulatory Commission ("FERC" or "Commission") raise related jurisdictional questions as to which arm of the Department of Energy has authority to regulate imported natural gas sales once the importation itself has been approved. The petitions also challenge the merits of the decisions. Southwest Gas Corporation, a customer of a pipeline company that imports gas from Canada, claims that FERC has the power, in setting pipeline rates, to disallow certain of the costs of importing natural gas on the grounds that the terms agreed to were imprudent. In addition, the aligned peti-

---

* The Honorable Thomas F. Hogan, of the United States District Court for the District of Columbia, sitting by designation pursuant to 28 U.S.C. § 292(a).

tioners, which include both Canadian gas exporters and domestic pipelines that are importing gas from them, claim that FERC must not only allow the pipelines to pass costs through to their customers, but must allow them to pass the costs through on an as-billed basis (*i.e.*, to include the demand charges they pay exporters in the demand rates they charge customers, and the commodity charges they pay exporters in their commodity rates). Finally, one of the Canadian exporters, ProGas Limited, claims that FERC was obligated to permit its customer, Natural Gas Pipeline Company of America ("NGPL"), to pass through costs as-billed because they used part of the Alaska Natural Gas Transportation System to transport the gas. We uphold FERC's decisions and deny the petitions.

### I. REGULATORY BACKGROUND

Congress made the regulation of natural gas the responsibility of the Department of Energy when it created the cabinet-level department in the 1977 Department of Energy Organization Act, Pub.L. 95–91, 91 Stat. 565 (1977), *codified in part at* 42 U.S.C. §§ 7111 *et seq.* (1982). The Act also created an independent agency within the Department, the Federal Energy Regulatory Commission, which was given jurisdiction over the rates for transportation and sale of natural gas in domestic interstate commerce and the power to issue or refuse certificates of public convenience and necessity for domestic gas facilities. *See* 42 U.S.C. § 7172(a)(1)(C), (D) (delegating administration to FERC of §§ 1, 4, 5, 6 and 7 of the Natural Gas Act ("NGA"), 15 U.S.C. §§ 717, 717c, 717d, 717e, 717f (1982)). FERC was not given jurisdiction over imports and exports of natural gas. The Act expressly provided that FERC could not exercise any of its powers over interstate transportation of gas when the gas involved was an import or export "unless the Secretary assigns such a function to the Commission." 42 U.S.C. § 7172(f). The Secretary was given the authority to regulate gas imports under § 3 of the NGA, 15 U.S.C. § 717b. *See* 42 U.S.C. § 7151(b) (vesting remaining powers of the Federal Power Commission in the Secretary). The Secretary was also given authority "to del-

egate any of his functions to such officers and employees of the Department" as he deems appropriate, *see* 42 U.S.C. § 7252, including the Economic Regulatory Administration ("ERA"), *see* 42 U.S.C. § 7136(b).

At first, the Secretary delegated virtually all authority over imported gas to the ERA, an administration within the Department of Energy. *See* Delegation Order No. 0204–4, 42 Fed.Reg. 60,726 (1977). From 1978 and continuing during all times relevant to these petitions, responsibility for the regulation of the importation and exportation of natural gas was divided between ERA and FERC. *See* Importation and Exportation of Natural Gas, 43 Fed. Reg. 47,769 (1978); Delegation of Functions by the Secretary of Energy to the Administrator of the Economic Regulatory Administration and to the Federal Energy Regulatory Commission, 44 Fed.Reg. 56,735 (1979); New Policy Guidelines and Delegation Orders From Secretary of Energy to Economic Regulatory Administration and Federal Energy Regulatory Commission Relating to the Regulation of Imported Natural Gas and Delegation Orders No. 0204–111 and No. 0204–112, 49 Fed.Reg. 6684 (1984) ("1984 Guidelines").

The 1984 Guidelines were in effect at the time the cases under consideration were heard by FERC. These orders delegate authority under § 3 of the NGA to ERA and authority under §§ 4, 5 and 7 of the NGA to FERC. The 1984 Guidelines explain that, because imported gas reaches the consumer through the same transportation systems that deliver domestic gas, FERC is given certain regulatory responsibilities for imports, such as siting and construction of facilities, and ratemaking. But FERC is constrained in exercising those responsibilities. The Guidelines provided:

> In regulatory decisions on a gas supply authorized for importation, the Commission will adopt the terms and conditions attached by the ERA Administrator to the import authorization, thus acting consistently with the determinations made by the Administrator and the policy considerations reflected in the authorization.

1984 Guidelines, 49 Fed.Reg. at 6689.

On February 7, 1989, the Secretary transferred the responsibility for regulat-

ing imported natural gas to the Assistant Secretary for Fossil Energy on precisely the same terms as it had been delegated to the ERA. *See* Delegation Order No. 0204–127, 54 Fed.Reg. 11,436 (1989). To minimize confusion, this opinion will refer to the § 3 authority as resting with the ERA, as it did when the cases below were decided. It is to be understood, however, that this decision is fully applicable to the current distribution of authority between the Assistant Secretary for Fossil Energy and FERC.

## II. THE PRUDENCE ISSUE

Southwest Gas Corporation ("Southwest"), a gas distributor in Nevada, Arizona and California, purchases most of the gas for its northern Nevada system from Northwest Pipeline Corporation ("Northwest"). Northwest, in turn, has entered into several letter agreements with a Canadian exporter, Westcoast Transmission Company Limited ("Westcoast"), for the purchase of Canadian gas. Southwest maintains, and has maintained before both FERC and ERA, that the letter agreements between Northwest and the exporter are imprudent because Northwest could have obtained gas on better terms. Before FERC, Southwest argued that because the terms were imprudent, FERC should disallow some of the costs incurred in setting the rates it and other customers must pay Northwest. *Cf. Pacific Indonesia LNG Co.*, 55 F.P.C. 1601 (1976) (stating policy that only prudently incurred costs should be passed on to consumers of natural gas); *Office of Consumers' Counsel v. FERC*, 783 F.2d 206, 213–14 (D.C.Cir.1986) (discussing Congress' 1978 restrictions on FERC's discretion as to what is imprudent).

Southwest petitions for review of six FERC rulings, involving the Northwest/Westcoast letter agreements from 1984, 1986 and 1987. In each ruling, FERC declined to perform a prudence review on the ground that to do so would be inconsistent with ERA's import authorization. The question before this court is whether FERC has jurisdiction to review gas import contracts for prudence after the ERA has approved the imports.

The imported gas covered by the three letter agreements were not the subject of specific import authorization decisions by ERA. Rather, ERA had generally authorized Northwest to import gas from Westcoast up to a certain volume and price in 1981. *See Pacific Gas Transmission Company, et al.*, 1 E.R.A. ¶ 70,528, at 72,-140–41 (1981). The letter agreements revised the specific terms between Northwest and Westcoast to permit Northwest to import gas at a lower price by using a two-part rate structure. Because the revised price was lower and the volumes still within the maximum authorized in 1981, Northwest was not required to obtain further authorization from ERA. Nonetheless, Northwest did ask ERA to declare that its 1984 letter agreement was in the public interest, which ERA did. *Northwest Pipeline Corporation*, 1 E.R.A. ¶ 70,604, at 72,-428 (1985).

Southwest's petition to ERA for rehearing was denied. *Northwest Pipeline Corporation*, 1 E.R.A. ¶ 70,609 (1985). Northwest did not ask ERA to make a declaration that the 1986 or 1987 agreements were in the public interest and ERA has issued no statements concerning them. On February 2, 1987, Southwest filed a motion before ERA challenging the prudence of the 1986 letter agreement, which is still pending. Only Southwest's challenges to FERC's decisions are before this court and we intimate no review of any ERA decisions pertinent to this dispute.

FERC has consistently maintained that it does not have the authority, under the 1984 Guidelines, to perform a prudence review of the terms of import/export contracts that are authorized by ERA. In declining to review whether the 1986 letter agreement was prudent, FERC said that such a review would be inconsistent with ERA's determinations and policy considerations, because rejecting the contract would significantly alter the approved arrangements. *Northwest Pipeline Corporation*, 37 F.E.R.C. ¶ 61,255, at 61,646 (1986). Some months later, in declining to review the

prudence of the 1984 letter agreement, FERC again said that such a review was inconsistent with ERA's import authorization. FERC explained that in order to grant the authorization, ERA had to find that the import was not inconsistent with the public interest, and this conclusion subsumed a finding of prudence. *Northwest Pipeline Corporation,* 39 F.E.R.C. ¶ 61,215, at 61,751 (1987). FERC concluded that to review the import terms for prudence would be a collateral attack on the ERA's import authorization. *Id.*

ERA has embraced FERC's reasoning. In a 1988 decision involving different parties, ERA responded to a request that it declare that FERC has jurisdiction to evaluate the prudence of purchasing imported gas. ERA held:

> Although the ERA has not made an explicit prudency finding in approving imports under Section 3 of the NGA, a determination that an import arrangement is not inconsistent with the public interest reflects consideration of matters relevant to the prudency of that arrangement and necessarily subsumes a finding that an import is not imprudent.

*EnTrade Corporation,* 1 E.R.A. ¶ 70,774, at 72,887 (1988).

 We find that FERC's and ERA's interpretation of the Secretary's delegation orders is reasonable. Congress specifically precluded FERC from exercising its general ratemaking authority over imported gas except to the extent that the Secretary expressly delegates that task to FERC. *See* 42 U.S.C. § 7172(f). The governing delegation orders permit FERC to set rates for interstate importation of gas only to the extent that this is consistent with the determinations and policies of ERA. *See* 1984 Guidelines, 49 Fed.Reg. at 6689. Southwest claims that there is no inconsistency because if FERC found that the import agreements were imprudent, the Commission would not alter the terms of those agreements, but would merely disallow some of the pipeline's costs in setting the rates the pipeline could charge its customers. Southwest overlooks one critical aspect: the review it is demanding would require FERC to review the prudence of the same terms that ERA has already approved.

 ERA is required, by § 3 of the NGA, to authorize imports unless the proposed import "will not be consistent with the public interest." 15 U.S.C. § 717b. The 1984 Guidelines provide ERA with certain factors to consider in making this decision: the competitiveness of the imported gas, the need for it, and the security of the supply. *See* 1984 Guidelines, 49 Fed.Reg. at 6690. The 1984 Guidelines also explain that the Secretary has determined, as a matter of import policy, that market forces will generally bring about results more in the public interest than will extensive regulation. *See* 1984 Guidelines, 49 Fed.Reg. at 6685. The Department of Energy's policy requires ERA to authorize imports where the contract terms are sufficiently flexible to respond to changing market conditions, a showing is made that, in the particular case, market forces have not resulted in agreements to bring in gas on a needed, competitive and secure basis. *See* 1984 Guidelines, 49 Fed.Reg. at 6687.

Thus, the authorization of a given volume of gas at up to a particular price is a decision by ERA that the particular import is in the public interest, and that no market failure has been shown that has or would interfere with the pipeline's acting in its own interest to acquire gas on the most favorable terms. For FERC to take a second look at the arrangement between pipeline and exporter and decide whether the pipeline did in fact arrange reasonably prudent terms would be to say that the Commission may reevaluate either ERA's factual determinations or its policy. This, however, is what FERC is specifically prohibited from doing. *See* 1984 Guidelines, 49 Fed.Reg. at 6689.

Southwest's argument that ERA does not consider prudence because it does not focus on whether the pipeline could have obtained the gas elsewhere for less is, in reality, a policy disagreement. ERA presumes, following the 1984 Guidelines, that the terms are prudent if they are freely negotiated and flexible, unless this pre-

sumption is rebutted. *See* 1984 Guidelines, 49 Fed.Reg. at 6687–88. Southwest apparently disagrees with this presumption and wants ERA to conduct detailed reviews of the pipeline's options rather than rely on market forces. Congress, however, left the definition of what constitutes the public interest to the Secretary. The 1984 Guidelines represent the Secretary's current definition and have previously been upheld, in a different context, by this court. *See Panhandle Producers and Royalty Owners Association v. ERA*, 822 F.2d 1105, 1113 (D.C.Cir.1987) (finding rebuttable presumptions and burden shifting of 1984 Guidelines permissible). In any event, ERA's decisions are not under review in this proceeding.

Southwest argues that it has been left in regulatory limbo. When Southwest sought a rehearing of ERA's decision on the 1984 letter agreement, it claims that ERA sent it to FERC for a prudence review, *see Northwest*, 1 E.R.A. ¶ 70,609, at 72,445, and now FERC has sent it back to ERA. Southwest, however, mischaracterizes ERA's decision. ERA denied the petition, explaining that, in finding the agreement to be in the public interest, it had not exercised any authority under §§ 4 or 5 of the NGA, but that it did "deal with, and approve, the as-billed flow-through provision of the exporter-importer agreement [which] is an integral part of the arrangement presented for review." *Id.* ERA's opinion stated that FERC had the authority to regulate the interstate ratemaking implications of the import contract, but that "FERC will act in a manner consistent with the Secretary of Energy's delegation orders, Departmental policy, as contained in the policy guidelines, and DOE/ERA opinions and orders." *Id.* This statement is consistent with both FERC's position and ERA's exposition in *EnTrade Corporation*. ERA refused to reconsider its finding that the import was in the public interest based on whatever evidence Southwest had submitted and, while recognizing that FERC had ratemaking authority, advised Southwest that FERC was constrained to act consistently with ERA's determinations.

Southwest next complains that even if it made a showing that rebutted the market theory presumptions of ERA in this case, ERA would not or could not, under the 1984 Guidelines, revoke or modify its authorization. If ERA has exclusive jurisdiction, Southwest contends, ERA's unwillingness or inability under current guidelines to fulfill this review role violates the NGA. Whatever merit these contentions may have, they are not properly before this court. Southwest has only petitioned for review of certain FERC decisions. It did not petition for review of any ERA decisions. There is currently pending before ERA a petition, filed by Southwest, challenging the prudence of the 1986 letter agreement. If ERA's action on that petition is insufficient under the NGA, a petition for review of that decision would properly present the issue.

### III. THE AS-BILLED ISSUE

The export-import contracts signed by aligned petitioners include a two-part rate structure. The domestic pipelines pay the exporters a fixed demand charge, whether or not they buy any gas, and a commodity charge which varies with the amount of gas they do purchase. The exporter recovers his own costs through these charges. *See generally Atlantic Seaboard Corp. v. FPC*, 404 F.2d 1268 (D.C.Cir.1968). The contracts between the exporters and importers involved in these cases used the straight fixed-variable method in allocating costs. This permits all fixed costs to be recovered through the demand charge to the pipeline, including several categories of costs which, in equivalent domestic gas contracts, are included in the commodity charge: wellhead and production costs, and the portion of transportation costs that cover return on equity and related income taxes. The pipelines asked FERC to permit them to flow-through costs as-billed, which would permit them to include the wellhead and other costs above in their demand charges. This is, of course, advantageous to them because any cost included in a demand charge will be recovered, whereas any cost included in a commodity

charge will be recovered only to the extent that their customers buy the imported gas.

In *Natural Gas Pipeline Co. of America,* 37 F.E.R.C. ¶ 61,215 (1986) ("Opinion 256"), *reh'g denied,* 39 F.E.R.C. ¶ 61,218 (1987) ("Opinion 256A"), FERC disallowed as-billed pass-through of the wellhead and other costs detailed above. FERC ordered costs to be allocated by the modified fixed-variable method in determining what rates the pipelines could charge their customers. This method allocates roughly 75 percent of fixed costs to demand charges but requires that wellhead and production costs, and the part of transportation costs that cover return on equity and related income taxes be recovered through commodity charges. Under the decisions, NGPL would pay for these costs as demand charges but bill its customers for them as commodity charges.

In subsequent cases involving Northwest, ANR Pipeline Company, Tennessee Gas Pipeline Company and Texas Eastern Transmission Corporation, FERC found that there were no relevant factual distinctions between the filings by these pipelines and that of NGPL and ordered them to allocate costs by the modified fixed-variable method as well.

## A. *FERC's Jurisdiction*

FERC's assertion of jurisdiction to decide this issue, unlike a prudence review, does not require it to reevaluate the import contracts themselves. Jurisdiction is based on the Secretary's delegation to FERC of authority over imported gas "upon its entry into the United States and as it flows through domestic gas transportation systems," as long as FERC acts consistently with ERA. 1984 Guidelines, 49 Fed.Reg. at 6689.

ERA recognized FERC's jurisdiction over cost classification in *Natural Gas Pipeline Co. of America,* 1 E.R.A. ¶ 70,645 (1986), when it explained that, although it approved the two-part rate and pass-through of costs in the import arrangement before it in principle, it had not necessarily endorsed

the passthrough of every single cost element exactly as proposed. It is within the FERC's jurisdiction in an exercise of its authority under Sections 4 and 5 of the NGA to approve these specific elements while acting in a manner consistent with the ERA's decisions and the DOE's policies. *Clearly, if there are components of a demand charge, such as production-related costs, that the FERC would not normally permit to be treated as fixed costs, the Canadian import should be treated no differently.* However, if the international contract, freely negotiated by commercial parties and approved by the ERA, includes cost recovery provisions that achieve reasonable results and are in compliance with applicable laws, the ERA urges regulatory restraint from any unnecessary intrusion into private contract matters.

1 E.R.A. ¶ 70,645, at 72,533 (emphasis added). The Department of Energy has also acknowledged FERC's jurisdiction to reclassify costs, in official comments submitted before the Commission in a 1985 rulemaking proceeding. The Department's comments explained that it saw no reason for denying as-billed pass-through to imported gas when such treatment is available for domestic gas. The Commission continued:

> If the Commission has concerns about the allocation of imported gas costs between demand and commodity charges, it has sufficient authority to take appropriate action.

Opinion 256, at 61,543, *quoting* Comments of the United States Department of Energy, FERC Docket No. RM85-1-000 (Part D), November 18, 1985, at 7.

 Thus, FERC has the authority to reclassify costs as long as that classification is consistent with ERA's import authorizations. Aligned petitioners claim that FERC's reclassification is inconsistent, in the first place, with ERA's finding that the import will be competitive. Yet petitioners fail to appreciate the differences between ERA's and FERC's findings. ERA's finding that the gas is competitive is only a finding that there is a market for it.

FERC's finding that the gas would have a competitive advantage if the pipeline were permitted to flow costs through as-billed neither contradicts ERA's finding nor is inconsistent with it. It is almost inevitable that there would be a market for gas that had a competitive advantage.

■ Aligned petitioners also claim that FERC's reallocation is inconsistent because ERA specifically approved as-billed pass-through for these imports. It is true that ERA said, in an early *Northwest* decision, that it approved of the contract's as-billed pass-through provision, without addressing what FERC's precise authority in relation to this might or might not be. *See Northwest*, 1 E.R.A. ¶ 70,609, at 72,445. But the next year, in *Natural*, 1 E.R.A. ¶ 70,645, at 72,532–33, ERA clarified its position, stating expressly that its approval of the pass-through of costs was subject to such reclassification by FERC. In the face of ERA's assurance that FERC's reclassification of costs is not inconsistent with ERA's determinations, we are not prepared to find otherwise.

Aligned petitioners insisted at oral argument that FERC had not shown the required regulatory restraint. *Cf.* 1 E.R.A. ¶ 70,645, at 72,533. It is unclear what legal implications would attach to a finding that FERC acted consistently with ERA's determinations and policies, but in an unrestrained manner. Fortunately, we are not presented with such a case. FERC has done precisely what ERA would have it do. It has reclassified costs from demand to commodity rates, treating Canadian gas no differently than it treats domestic gas.

This court has previously upheld an analogous FERC decision. *See Wisconsin Gas Co. v. FERC*, 770 F.2d 1144 (D.C.Cir. 1985), *cert. denied*, 476 U.S. 1114, 106 S.Ct. 1968, 90 L.Ed.2d 653 (1986). In *Wisconsin Gas*, FERC had prohibited pipelines from including certain payments for imported gas in their minimum commodity bills, which are an irreducible minimum payment like demand charges. This court found that ERA's approval of the import contracts did not preempt FERC's action because FERC's decision only altered the terms of the contracts between the pipeline and its customers, not the terms of the contract between the pipeline and their Canadian supplier. *Id.* at 1156. This court further found that the fact that FERC's action made the terms of the import contracts more burdensome to the importer did not mean that the action was inconsistent with the terms of the import authorization or policy considerations underlying it. *Id.* Otherwise, the court explained, any exercise of FERC's responsibilities vis-a-vis imported gas would be precluded. *Id.*

As in *Wisconsin Gas*, the FERC decisions under review here only alter the terms of the contracts between the pipelines and their customers and make their terms more burdensome to the pipelines. They do not require FERC to review the contracts between the pipelines and the exporters, nor do they demand anything inconsistent with ERA's approval of those contracts. We find, therefore, that the rationale of *Wisconsin Gas* applies to the allocation of costs between demand and commodity charges in setting rates for imported gas once it enters the United States, and that FERC had jurisdiction to reclassify the costs in the cases challenged by aligned petitioners.

B. *18 C.F.R. § 154.38(d)(4)(ii)*

Aligned petitioners also challenge FERC's decisions as not in accordance with FERC's own regulations. *Cf.* 5 U.S.C. § 706(2)(A). One of the regulations in effect when these cases were decided established how changes in the cost of gas to a pipeline were to affect its rates. The regulation provided that changes in the cost of gas from a pipeline supplier to a pipeline could be passed through on an as-billed basis in the pipeline's rates. *See* 18 C.F.R. § 154.38(d)(4)(ii) (1986). The regulation does not specify whether it is applicable to imported gas or only to domestic gas. Since these cases were decided, FERC has adopted a regulation that specifies that imported gas cost changes are to be applied to pipeline rates using a methodology approved by the Commission. *See* 18 C.F.R. § 154.305(b)(3)(ii) (1988).

Aligned petitioners argue that the regulation in effect when their cases were decided required that imported gas costs be passed through as-billed. FERC maintains that the term "gas" meant "domestic gas" only. *See* Opinion 256, at 61,544. In evaluating aligned petitioners' claim, this court is obliged to give considerable deference to the agency's interpretation of its own regulation, according it controlling weight unless it is plainly erroneous or inconsistent with the regulation. *See Udall v. Tallman*, 380 U.S. 1, 16–17, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965). Deference is particularly required when the agency construction rests on matters peculiarly within the agency's field of expertise. *See Stuart–James Co. v. Securities and Exchange Commission*, 857 F.2d 796, 800 (D.C.Cir. 1988).

In this instance, FERC's interpretation of its regulation is based on the policy considerations underlying the regulations, which is necessarily a matter peculiarly within the Commission's field of expertise. FERC explains that the regulation was premised on the Commission's regulation of upstream producers' and suppliers' rates, a premise which is only applicable to domestic gas. For domestic gas, FERC allocates costs at the producer to supplier stage in approving rates. Further reclassification down the line, FERC contends, would distort this allocation and interfere with whatever policies FERC implemented through its initial allocation. Therefore, its regulation requires costs to be passed through down the line on an as-billed basis. In contrast, FERC has no regulatory authority over how foreign producers or pipeline suppliers bill their costs through to importers. The parties negotiate these terms. FERC's first access for regulating imported gas rates is at the pipeline-to-customer stage.

Aligned petitioners claim that FERC's prior decisions indicate that it interpreted the regulation to include imported as well as domestic gas and that the explanation proffered in Opinions 256 and 256A represents an unexplained change in the Commission's interpretation and thus deserving of little deference. Aligned petitioners are correct that prior decisions permitted pipelines to pass-through their imported gas costs as-billed. *See, e.g., Midwestern Gas Transmission Co.*, 31 F.E.R.C. ¶ 61,309 (1985); *InterCity Minnesota Pipelines, Ltd.*, 31 F.E.R.C. ¶ 61,238 (1985). They are not correct, however, in their implication that permission was based, in their prior decisions, on the regulation in question. At most, these decisions represent a previous policy of permitting as-billed pass-through for imported gas from which FERC departed for the reasons given in Opinions 256 and 256A. Yet, while FERC's earlier imported gas decisions do not shed light on the consistency of FERC's interpretation of this regulation, some of its earlier domestic gas decisions do. In *Northwest Alaskan Pipeline Co.*, 11 F.E.R.C. ¶ 61,088, at 61,182 (1980), for example, the Commission gave the same explanation of the policy behind the regulation as in Opinion 256.

We find, in light of this explanation, the consistency of FERC's position, and the inherent ambiguity of the language, that FERC's interpretation is neither clearly erroneous nor inconsistent with the regulation. Therefore, we defer to the Commission's reading of the regulation as applicable only to domestic gas and find that FERC did not act incompatibly with it.

## C. *Other Challenges*

Aligned petitioners contend that FERC's decisions in Opinions 256 and 256A and its application of them to other rate filings are irrational and unsupported by substantial evidence. *Cf.* 5 U.S.C. § 706(2)(A), (E). FERC's reason for reclassifying the costs at issue was that it wished to avoid a regulatory distortion that would have resulted in Canadian gas enjoying a competitive advantage over domestic gas, in accordance with ERA's policy, *see* 1 E.R.A. ¶ 70,645, at 72,532, that domestic and imported gas should be treated the same. *See* Opinion 256, at 61,546; Opinion 256A, at 61,766. FERC reclassified some of petitioners' fixed costs because petitioners' classification would have allowed them to recover all of their fixed costs through their demand charges, whereas domestic

pipelines must recover some through their commodity charges. This would have permitted Canadian gas to enjoy a competitive advantage because pipelines would both be at less risk when buying Canadian gas, and better able to attract customers, as many customers comparison-shop based on commodity charges alone. *See* Opinion 256A, at 61,770–71.

▉▉▉ Aligned petitioners mount several challenges to FERC's claim that it reallocated costs in order to create a level playing field between domestic and imported gas. First, they claim that FERC acted irrationally because it is unable to impose this cost classification on all gas, since local distributing companies and brokers import gas under ERA authorizations but are regulated by state agencies rather than FERC. Aligned petitioners do not argue that FERC's policy will be ineffective because of the quantity of gas that is not subject to its rule. Rather, they apparently would have this court accept the proposition that whenever an agency's jurisdiction is not plenary, it is powerless to act. This is not and never has been the law. *Cf. Texas Eastern Transmission Corp. v. FPC*, 414 F.2d 344, 350 (5th Cir.1969) (upholding order requiring pipeline to pass on refunds owed to consumers even though states have jurisdiction to determine whether the consumers actually receive the refunds, on the ground that the Commission acted rationally), *cert. denied*, 398 U.S. 928, 90 S.Ct. 1817, 26 L.Ed.2d 89 (1970). FERC cannot be said to be irrational in using its powers to reduce regulatory distortions in the market by requiring costs of imported gas to be allocated in the same manner as domestic gas.

Second, aligned petitioners argue that FERC's decisions were arbitrary and capricious because FERC itself has declined to impose a level playing field consistently even where it has regulatory authority, citing two 1987 decisions where FERC approved as-billed pass-through for imported gas. *See Boundary Gas, Inc.*, 40 FERC ¶ 61,047, at 61,146, *reh'g denied*, 40 F.E.R. C. ¶ 61,302 (1987); *Great Lakes Gas Transmission Co.*, 41 F.E.R.C. ¶ 61,292 (1987).

These decisions do not help aligned petitioners' argument, however. In *Boundary Gas*, FERC allowed a facilitator run by members to pass costs through as-billed to its members. But FERC has imposed the modified fixed-variable method for allocating costs on its members. *See, e.g., Granite State Gas Transmission, Inc.*, 40 F.E. R.C. ¶ 61,043 (1987). In *Great Lakes*, FERC permitted a conduit whose customers negotiated directly with Canadian exporters for gas to pass-through costs as-billed. But, again, FERC has required Great Lakes' customers, two pipelines involved in the cases at bar, to pass-through costs by the modified fixed-variable method. In both decisions, FERC merely chose to intervene and reclassify costs slightly farther downstream because of the particular circumstances. The result for the consumer is the same. Thus, these decisions cannot be said to cast doubt on FERC's rationality in reclassifying the costs at issue.

Third, aligned petitioners contend that FERC's decisions were arbitrary because the policy underlying cost allocation for domestic gas is irrelevant to imported gas. Aligned petitioners misjudge the question. It is true that the modified fixed-variable method of allocating costs is partly aimed at encouraging prudent behavior by producers by placing certain costs at risk and that FERC has no jurisdiction over Canadian producers. But FERC's rationale for imposing the method on the pipelines in the cases *sub judice* was not to affect the Canadian producers, but to avoid giving pipelines the competitive advantage of a "complete absence of risk with regard to fixed transmission costs" when they use Canadian gas rather than domestic. Opinion 256, at 61,546.

Fourth, aligned petitioners maintain that FERC's decision is not supported by substantial evidence on the record as a whole. *Cf. Wisconsin Gas*, 770 F.2d at 1156. Aligned petitioners point out that FERC had no quantitative evidence on the record and that therefore its conclusions rest on bare economic theory which they claim is insufficient as a matter of law. Aligned petitioners' reliance on *Electricity Con-*

sumers Resource Council v. FERC, 747 F.2d 1511 (D.C.Cir.1984), for this proposition is misplaced. That case does not say that bare economic theory is insufficient as a matter of law. It specifically held that reliance on pure theory was not the problem with FERC's decision. *Id.* at 1518. The court reversed the Commission because it found that FERC had based its approval on a theory that had not actually been used to set the rates approved. *Id.* In contrast, FERC's theory here, that different cost allocation methods would affect the relative competitive positions of imported and domestic gas, was relevant to the cases before it. Furthermore, it is a theory we have previously endorsed. *See East Tennessee Natural Gas Co. v. FERC*, 863 F.2d 932, 939 (D.C.Cir.1988).

Petitioners do not challenge FERC's assertion that domestic supplies with two-part rates use the modified fixed-variable cost method of allocating costs or that NGPL's proposed allocation of costs differed in several significant respects and would have resulted in more costs recovered through demand charges and fewer through commodity charges. Nor do petitioners challenge FERC's conclusion that a pipeline is at greater risk when fixed costs are recoverable through commodity charges than when they are recoverable through demand charges. Furthermore, FERC's finding that many customers compare commodity charges alone when shopping for gas was supported by expert testimony on the record and not contradicted. The only record evidence adduced by aligned petitioners to undermine FERC's conclusions is evidence that NGPL bought very little Canadian gas in 1986 and the beginning of 1987. FERC acknowledged this evidence and ignored it as irrelevant. *See* Opinion 256A, at 61,771. We agree that this evidence, by itself, fails to contradict FERC's market theory. FERC's theory was that, all other things being equal, as-billed pass-through for Canadian gas would give it a competitive advantage over domestic gas. Nothing in the record establishes that NGPL chose to buy domestic gas rather than Canadian gas when the two were identical in price and other terms,

and the only difference was the cost recovery method. This is not to say that FERC's decisions would not have been stronger if they had included actual data, but FERC's approach was plausible and within its expertise.

Finally, aligned petitioners challenge the application of the policy developed in Opinions 256 and 256A to the other pipelines as arbitrary and capricious. Petitioners do not, as indeed they cannot, assert that it is not permissible for FERC to apply its analysis from Opinion 256 and Opinion 256A in a case with no relevant factual differences. *See Kansas Gas & Electric Co. v. FERC*, 758 F.2d 713, 721–22 (D.C. Cir.1985). FERC found in each case challenged here that there were no relevant factual distinctions, and petitioners point to none.

## IV. ALASKAN PIPELINE ISSUE

■ ProGas Limited, one of the Canadian exporters, challenge FERC's two *Natural Gas Pipeline Co. of America* decisions as either contrary to the NGA or as arbitrary and capricious, because among the demand charges that NGPL must pay ProGas but is being required by FERC to pass along in its commodity rates are transportation charges that ProGas pays Foothills Pipeline (Yukon) Ltd. ("Foothills"). Foothills operates the Canadian facilities on the eastern leg of the Alaskan Natural Gas Transportation System ("ANGTS"). Pro-Gas claims that other ANGTS pipelines are permitted as-billed pass-through and denial here constitutes unlawful discrimination.

To begin with, we note that the NGA prohibits "unreasonable differences in rates, charges, service, facilities, or in any other respect, as between localities or as between classes of service." 15 U.S.C. § 717c(b)(2). This court has held that differences in rates based on relevant, significant facts which are explained are not contrary to the NGA. *See Metropolitan Edison Co. v. FERC*, 595 F.2d 851, 857 (D.C. Cir.1979); *see also St. Michaels Utilities Commission v. FPC*, 377 F.2d 912, 915 (4th Cir.1967). Similarly, different rate treatment by FERC that is based on relevant,

significant facts which are explained would not be arbitrary and capricious.

FERC's opinion explains that previously it had only permitted as-billed pass-through for gas volumes that were part of the revenue stream supporting the financing of ANGTS pre-built facilities, a situation which it termed "sui generis." Opinion 256A, at 61,770. The opinion acknowledges that the volumes of gas at issue here do use the ANGTS facilities and are "generally supportive of the objectives of the pre-building program" and "necessary or related to the construction and initial operation of the ANGTS" but distinguishes them as not "essential to financing" or part of "the ANGTS stream of revenue" on which the financing of ANGTS' pre-built facilities was based. *Id.*

We find FERC's distinction reasonable because of the special history of the financing of ANGTS' construction. ANGTS is a unique project for which this country and Canada made mutual commitments, *see Wisconsin Gas*, 770 F.2d at 1163. In support of this, FERC has exempted, from otherwise applicable regulatory policies, the specific revenue stream on which the financing of the prebuilt facilities was based. *Id.* That the ProGas volumes at issue here are not part of this revenue stream is plainly a significant factual difference. FERC's decision not to expand the ANGTS exemption beyond the parameters which serve the narrow goal of protecting this revenue stream appears neither arbitrary nor unreasonably discriminatory.

### V. CONCLUSION

We uphold FERC's decisions in the six *Northwest Pipeline Corporation* rulings that the Commission lacked jurisdiction, under the Secretary of the Department of Energy's 1984 delegation orders, to perform prudence reviews of the terms of gas importation contracts already covered by an ERA import authorization. We also find that the Commission has jurisdiction under the Secretary's 1984 delegation orders to reclassify costs in setting interstate rates for imported gas, and that FERC's orders in the cases before this court were a legitimate, reasonable and reasonably supported exercise of the Commission's authority. Finally, we find no merit in Pro-Gas Limited's contention that its volumes should be uniquely exempt from FERC's orders because they are transported through ANGTS facilities. The petitions for review are

*Denied.*