# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued April 15, 2010          Decided August 13, 2010

No. 09-1016

INTERSTATE NATURAL GAS ASSOCIATION OF AMERICA,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

NEXTERA ENERGY RESOURCES, LLC, ET AL.,
INTERVENORS

———

Consolidated with 09-1024

———

On Petitions for Review of Orders
of the Federal Energy Regulatory Commission

———

*Henry S. May Jr.* argued the cause for petitioners. With him on the briefs were *James E. Olson*, *Elizabeth B. Kohlhausen*, *Joan Dreskin*, *Timm L. Abendroth*, and *Dan Regan*.

*Lona T. Perry*, Senior Attorney, Federal Energy Regulatory Commission, argued the cause for respondent.

With her on the brief were *Thomas R. Sheets*, General Counsel, and *Robert H. Solomon*, Solicitor.

*William Thomas Miller*, *Joshua L. Menter*, *Andrew K. Soto*, *Dena E. Wiggins*, and *Jack N. Semrani* were on the brief for intervenors American Public Gas Association, et al. in support of respondent.

Before: BROWN and GRIFFITH, *Circuit Judges*, and RANDOLPH, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* BROWN.

BROWN, *Circuit Judge*: In *Interstate Natural Gas Association of America v. FERC*, 285 F.3d 18 (D.C. Cir. 2002) (*INGAA*), we upheld the Federal Energy Regulatory Commission's (FERC) decision to lift, for a two-year experimental period, cost-based price ceilings on natural gas shippers' releases of unused firm pipeline transportation capacity into the short-term (one year or less) market. We also sustained FERC's decision to retain price ceilings on short-term capacity sales by natural gas pipelines. Several years later, FERC issued new orders permanently lifting the price ceilings on short-term capacity releases by shippers while maintaining the ceilings on sales by pipelines. An industry association and several pipelines now petition for review of these orders. We conclude FERC's decision to retain price ceilings on pipeline capacity sales is consistent with our decision in *INGAA* and therefore deny the petitions.

I

Traditionally, an interstate natural gas pipeline "bundled" its sales and transportation services into a single package to sell to customers. *See United Distrib. Cos. v. FERC*, 88 F.3d

1105, 1125–26 (D.C. Cir. 1996) (*UDC*). In 1992, FERC, recognizing that bundling allowed pipelines to exploit their transportation monopoly to distort the sales market, issued Order No. 636, which restructured natural gas pipelines to enhance competition. *Pipeline Service Obligations and Revisions to Regulations Governing Self-Implementing Transportation Under Part 284 of the Commission's Regulations*, Order No. 636, 59 FERC ¶ 61,030 (1992), *order on reh'g*, Order No. 636-A, January 1991-June 1996 FERC Stats. & Regs. ¶ 61,272 (1992), *reh'g denied*, 62 FERC ¶ 61,007 (1993), *aff'd in part and remanded in part sub nom. United Distrib. Cos. v. FERC*, 88 F.3d 1105 (D.C. Cir. 1996), *order on remand*, Order No. 636-C, 78 FERC ¶ 61,186 (1997), *order on reh'g*, Order No. 636-D, 83 FERC ¶ 61,210 (1998). Pursuant to FERC's authority under the Natural Gas Act (NGA), Order No. 636 mandated pipelines "unbundle" their sales and transportation services, effectively deregulating the sales market while preserving cost-based regulation of pipelines' transportation services. *See UDC*, 88 F.3d at 1125–26. While acknowledging that Congress alone had authority to deregulate the natural gas market, FERC "'institut[ed] light-handed regulation, relying upon market forces . . . to constrain unbundled pipeline sale for resale gas prices within the NGA's "just and reasonable" standard.'" *Id*. at 1126 (quoting Order No. 636 at ¶ 30,440). FERC believed "open-access transportation [and] 'adequate divertible gas supplies . . . in all pipeline markets,' would ensure that the free market for gas sales would keep rates within the zone of reasonableness." *Id*. (quoting Order No. 636 at ¶ 30,437–43).

Order No. 636 also established a uniform national capacity release program to allow shippers that contracted with pipelines for rights to long-term firm transportation capacity to resell unused capacity directly to other shippers. *See id*. at 1149–51. Because FERC was concerned shippers

could exercise market power over these short-term transactions, FERC capped the purchase price for capacity releases by shippers at the same cost-based maximum rates FERC set for capacity sales by pipelines. *See id*. at 1150.

Numerous parties from the natural gas industry filed petitions for review of Order No. 636. In *UDC*, we generally upheld FERC's regulatory reforms. In particular, we dismissed the argument made by several shippers that FERC impermissibly had restricted the maximum allowable rate for shipper capacity releases to the same rate as pipeline capacity sales, accepting the Commission's response that it had an insufficient factual record to resolve the issue. *Id*. at 1160.

After studying the effects of Order No. 636 on the natural gas market, FERC discovered the cost-based price ceilings imposed on the capacity release market might be harming the very shippers they were meant to protect. *See INGAA*, 285 F.3d at 30. During periods of peak demand, for instance, the ceilings prevented shippers willing to pay market prices for short-term capacity from purchasing unused capacity held by other shippers willing to sell it at market prices. *Id*. Therefore, in 2000, FERC issued Order No. 637, which, *inter alia*, modified the capacity release program by eliminating, for an experimental two-year period, the price ceilings on shipper releases of long-term firm capacity into the short-term market. *Regulation of Short-Term Natural Gas Transportation Services, and Regulation of Interstate Natural Gas Transportation Services*, Order No. 637, FERC Stats. & Regs. ¶ 31,091, 65 Fed. Reg. 10156 (2000), *order on reh'g*, Order No. 637-A, FERC Stats. & Regs. ¶ 31,099 (2000), *order denying reh'g*, Order No. 637-B, 92 FERC ¶ 61,062 (2000), *aff'd in relevant part sub nom. INGAA v. FERC*, 285 F.3d 18 (D.C. Cir. 2002). Nevertheless, FERC maintained the price ceilings on pipeline capacity sales.

The Interstate Natural Gas Association of America (INGAA) and other parties challenged Order No. 637 before this court in *INGAA*. There, we upheld FERC's decision to lift the price ceilings on shippers in light of three principles. First, we noted FERC was due "special deference" for its experiment. *INGAA*, 285 F.3d at 30. Second, we observed that "the basic premise of the NGA is the understanding that natural gas pipeline transportation is generally a natural monopoly," so FERC faced an "uphill fight" to justify market-based rates under those circumstances. *Id*. at 30–31.

Finally, we noted our decision in *Farmers Union Central Exchange, Inc. v. FERC*, 734 F.2d 1486 (D.C. Cir. 1984), provided "general guidance for our review of FERC's decision to elect more relaxed[,] 'lighthanded' . . . regulation than traditional cost-based ceilings, in the context of a mandate to set 'just and reasonable' rates in an industry generally thought to have the features of a natural monopoly." *INGAA*, 285 F.3d at 31. Applying the *Farmers Union* test, we concluded "in this context competition has every reasonable prospect of preventing seriously monopolistic pricing," and "together with the non-cost advantages . . . and the experimental nature of this particular 'lighthanded' regulation," FERC's decision did not violate the NGA and was not arbitrary and capricious. *Id*. at 35.

We also considered whether FERC's decision to maintain the price ceilings on pipelines while lifting them on shippers was discriminatory or arbitrary and capricious. We concluded FERC's purportedly discriminatory treatment of pipelines was "not unreasonable" because it rested on a "reasonable distinction[] . . . between pipelines and other holders of unused capacity, based on probable likelihood of wielding market power." *Id*. at 35–36. We therefore sustained FERC's decision to regulate pipeline sales at cost-based rates.

In August 2006, two shippers petitioned FERC to modify its rate cap regulations by lifting the price ceilings on shipper capacity releases. FERC responded in January 2007 by seeking comment on whether changes to the capacity release program could improve market efficiency. *Pacific Gas & Elec. Co.*, Request for Comments, 118 FERC ¶ 61,005 (2007). Later that year, FERC proposed permanently removing the price ceiling on short-term capacity release transactions of one year or less by shippers. *Promotion of a More Efficient Capacity Release Market*, Notice of Proposed Rulemaking, 121 FERC ¶ 61,170 (2007). Once again, FERC indicated it did not intend to lift the ceilings for pipelines. *Id*. at ¶¶ 46–52. More than sixty entities from the natural gas industry commented on FERC's proposed rule.

In 2008, FERC issued its final rule, *Promotion of a More Efficient Capacity Release Market*, Order No. 712, 123 FERC ¶ 61,286 (2008) ("Order No. 712"), and an order on rehearing, *Promotion of a More Efficient Capacity Release Market*, Order No. 712-A, 125 FERC ¶ 61,216 (2008) ("Order No. 712-A") (collectively the "Orders"). Predictably, Order No. 712 lifted the price ceilings for short-term capacity releases by shippers but retained the ceilings for capacity sales by pipelines. INGAA and two pipelines, Spectra Energy Transmission, LLC and Spectra Energy Partners, LP, then filed the instant petitions for review.

II

A

This court reviews FERC's orders under the Administrative Procedure Act's (APA) arbitrary and capricious standard and upholds FERC's factual findings if supported by substantial evidence. *See Wash. Gas Light Co.*

*v. FERC*, 532 F.3d 928, 930 (D.C. Cir. 2008). We generally limit our review under the NGA "to assuring that the Commission's decisionmaking is reasoned, principled, and based upon the record." *Am. Gas Ass'n v. FERC*, 593 F.3d 14, 19 (D.C. Cir. 2010). And we afford FERC "broad discretion to invoke its expertise in balancing competing interests and drawing administrative lines." *Id.* In particular, when FERC's "orders involve complex scientific or technical questions, . . . we are particularly reluctant to interfere with the agency's reasoned judgments." *B&J Oil & Gas v. FERC*, 353 F.3d 71, 76 (D.C. Cir. 2004). "Nevertheless, [FERC] must examine the relevant data and articulate a satisfactory explanation for its action, including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

Petitioners do not challenge FERC's decision to lift the price ceilings for shippers. Therefore, we need only address whether FERC also should have lifted the price ceilings for pipelines. In this regard, Petitioners argue *INGAA* is inapplicable because FERC's decision to lift the price ceilings in Order No. 637 was an experimental step in a gradual process of reform, while Order No. 712 reflects a permanent change in the Commission's policies.

Petitioners correctly observe that in *INGAA* we noted we "give[] special deference to agency development of . . . experiments . . . because of the advantages of data developed in the real world." *INGAA*, 285 F.3d at 30. However, Petitioners are mistaken when they suggest *INGAA* is therefore distinguishable from the matter now before us. The special deference we afford to FERC's experiments is merely intended to give the agency a chance to generate "real world" data on which to base more lasting policies. *See Pub. Serv.*

*Comm'n of State of N.Y. v. Fed. Power Comm'n*, 463 F.2d 824, 828 (D.C. Cir. 1972) (affirming agency's experimental policy to increase the interstate flow of natural gas because record did not show policy "*will not* work"). Once the data is available, FERC may adjust or reaffirm its policies. *Id.* FERC followed this course in Order No. 712 when it adopted on a permanent basis the regulations it had implemented on an experimental basis in Order No. 637. But this shift does not make *INGAA* irrelevant. The relevant distinction between *INGAA* and the instant petitions is that here we expect FERC to support its decision with substantial record evidence to justify a *permanent* change in policy, rather than a *temporary* experiment.

In any event, we did not find the "extra layer of deference" dispositive in *INGAA*, just as we did not consider the NGA's presumption in favor of cost-based regulation to have settled the matter. *INGAA*, 285 F.3d at 30–31. Instead, our analysis in *INGAA* turned on whether FERC's decision to adopt more light-handed, market-based regulation was consistent with *Farmers Union*, *id.* at 31–35, and whether FERC's disparate treatment of shippers and pipelines was based on a reasonable distinction, *id.* at 35–36. Order No. 712 concerns similar issues, and we therefore apply the framework we announced in *INGAA*.

B

Petitioners' objections to the Orders arise from misconceptions about FERC's authority under the NGA.

First, Petitioners contend the short-term capacity market is a single market and argue that because FERC lifted the price ceilings on one category of market participants (shippers), it had to lift the ceilings for all market participants,

including pipelines. Petitioners argue FERC's failure to lift the ceilings for pipeline sales has resulted in impermissible asymmetric regulation. Petitioners' argument is based on the flawed premise that FERC must regulate every category of market participant in precisely the same manner. As we discussed in *INGAA*, the NGA authorizes FERC to treat pipelines and shippers differently based on "reasonable distinctions." *INGAA*, 285 F.3d at 36; *see*, *e.g.*, *TransCanada Pipelines Ltd. v. FERC*, 878 F.2d 401, 413 (D.C. Cir. 1989) ("The NGA prohibits '*unreasonable* differences in rates . . . as between classes of service.'" (quoting 15 U.S.C. § 717c(b)(2) (emphasis added))). We "ha[ve] held that differences in rates based on relevant, significant facts which are explained are not contrary to the NGA . . . [and thus] different rate treatment by FERC that is based on relevant, significant facts which are explained would not be arbitrary and capricious." *TransCanada*, 878 F.2d at 413–14.

Here, FERC acknowledged it was treating shippers and pipelines differently in Order No. 712, but it offered a reasonable explanation for this disparate treatment. *See* Order No. 712 ¶¶ 95–102. Prior to Order No. 712, FERC already offered pipelines pricing flexibility, including negotiated and seasonal rates, and FERC thus sought to offer pricing flexibility to shippers as well. However, FERC explained it could not give identical pricing flexibility to pipelines because of concerns the pipelines could wield market power. We found this distinction between pipelines and shippers to be reasonable in *INGAA*, and we reach the same conclusion here. *See INGAA*, 285 F.3d at 35 ("[W]hereas the uncontracted capacity of a pipeline is presumptively available for the short-term market, no such presumption makes sense for the non-pipeline capacity holders: they presumably contracted for the capacity in anticipation of actually using it.").

FERC offered another important reason for treating pipelines and shippers differently. If pipelines could charge market-based rates in the short-term market, they might withhold construction of new capacity to take advantage of the opportunity to earn scarcity rents in the short-term market. *See, e.g.*, Order No. 712 ¶ 85. Petitioners claim their construction decisions are not influenced by prices in the short-term market, but this claim relies on nothing more than assertions in an expert's affidavit. Petitioners did not adduce evidence contradicting FERC's plausible concern, informed by economic theory, that "if pipelines with market power find that maintaining scarce pipeline capacity increases their profits, then they will have much less incentive to construct long-term capacity because such capacity could result in lower profitability." Order No. 712-A ¶ 36. On this record, we defer to the Commission's view. *See TransCanada*, 878 F.2d at 412–13.

Next, Petitioners suggest FERC was obligated to remove the price ceiling for pipelines because the Commission found the short-term capacity release market was "generally competitive." Order No. 712 ¶ 39. If the market is truly competitive, say Petitioners, pipelines should be able to charge market-based rates. Petitioners have taken FERC's statement out of context. The key to properly interpreting FERC's finding is in the modifier "generally." Based on the evidence before it, FERC explained it could not conclude the short-term market would remain competitive if the price ceilings were removed from pipeline sales. *See, e.g.*, Order No. 712 ¶¶ 61, 88; Order No. 712-A ¶¶ 22–28. The Commission thus found it necessary to retain the price ceilings on pipeline sales because, absent the recourse rate, pipelines might take advantage of their customers by exploiting market power. Order No. 712 ¶¶ 83, 88, 91, 102. FERC reached this conclusion by analyzing data it had

collected during the experimental period of Order No. 637, *id.* ¶¶ 42–44, and more recent data that confirmed contemporary market conditions were consistent with conditions FERC had observed under Order No. 637, *id.* ¶¶ 45–47. This data is just the sort of "real world" information we expected FERC to glean from its experiment in Order No. 637, and it provides substantial support for the Commission's policy. *See INGAA*, 285 F.3d at 30. There is no conflict between FERC's evidentiary finding and the regulatory choice it made.

Petitioners also argue that the pricing flexibility FERC offered shippers in Order No. 712 gives them an unfair competitive advantage over pipelines and that FERC has ignored the pipelines' alleged economic injuries. FERC responds that Petitioners are adequately compensated on a cost-of-service basis and that any extra revenues a pipeline could earn by charging market-based rates would be subject to adjustment during the pipeline's next NGA section 4 rate case. Petitioners insist this issue is not ripe for review and in the alternative assert FERC is wrong on the merits. Petitioners believe that if FERC lifted the price ceilings from pipeline sales, any revenues the pipelines earned in the short-term market would be unregulated revenues. We decline to resolve this issue but note Petitioners' argument reinforces the concern that motivated FERC to retain the price ceilings on pipelines. Without the price ceilings in place, pipelines might exercise market power, and FERC might be unable to remedy the resulting harm to customers.

Petitioners also argue Order No. 712 creates a bifurcated gas transportation market in which the capped pipeline prices will artificially inflate prices in the uncapped market for shipper-released capacity. This is a familiar argument. In *INGAA*, we noted that "distortions of [the market] seem likely in any such compromise, [which] is within the Commission's

purview so long as it rests on reasonable distinctions." *INGAA*, 285 F.3d at 36. We again find FERC's distinction, which is "based on probable likelihood of [pipelines] wielding market power," to be reasonable. *Id*. FERC acknowledged the risk of market distortion in Order No. 712 but observed it had taken steps to reduce the cost of arbitrage, thereby encouraging shippers to resell capacity to other shippers that would place a higher value on the capacity. *See* Order No. 712 ¶¶ 103–06. Furthermore, by "balancing the risks of creating a somewhat bifurcated market against the possibility of the exercise of market power by the pipelines in the short-term market," FERC made a reasonable judgment to "err on the side of enhanced protection against market power." *Id*. ¶ 108. FERC's decision is consistent with the NGA's "fundamental purpose . . . to protect natural gas consumers from the monopoly power of natural gas pipelines." *Nat'l Fuel Gas Supply Corp. v. FERC*, 468 F.3d 831, 833 (D.C. Cir. 2006).

Trying another tack, Petitioners assert FERC was arbitrary and capricious because the Commission failed to address the affidavit by their expert witness, Dr. Edward C. Gallick (Gallick Affidavit). Although FERC did not specifically refer to the Gallick Affidavit in the Orders, we do not find this troubling. In a rulemaking, FERC is not obligated to address expert witnesses by name so long as the Commission provides a reasoned response to all significant comments. *See Interstate Natural Gas Ass'n v. FERC*, 494 F.3d 1092, 1096 (D.C. Cir. 2007) (holding FERC has a "duty to give reasoned responses to all significant comments in a rulemaking proceeding"). The Gallick Affidavit was attached to the comments submitted by Petitioners Spectra Energy Transmission, LLC and Spectra Energy Partners, LP ("Spectra"). FERC sufficiently considered and responded to the Gallick Affidavit when responding to specific comments

by Spectra, INGAA, and other commenters. *See* Order No. 712 ¶¶ 87–108 (responding to specific comments about the evidentiary record, infrastructure incentives, competitive market structure, differences in regulatory treatment of pipeline capacity and shipper released capacity, and risk of bifurcated markets); Order No. 712-A ¶¶ 13–53 (responding to requests for rehearing regarding competitive market findings, withholding construction of needed pipeline infrastructure, pricing flexibility, and bifurcated markets). Finally, Petitioners' contention that FERC failed to adequately consider proposed alternatives has no merit. *See id*. ¶¶ 54–56 & n. 63 (rejecting alternatives proposed by Spectra on rehearing).

## III

FERC's decision to retain cost-based price ceilings on short-term capacity sales by pipelines is consistent with the framework set forth in *INGAA* and is supported by substantial evidence. Therefore, the petitions are

*Denied*.