ASSOCIATION OF BUSINESSES ADVOCATING TARIFF EQUITY and Process Gas Consumers Group, Petitioners,

v.

Rayburn HANZLIK, Administrator, Economic Regulatory Administration and Donald Paul Hodel, Secretary, United States Department of Energy, Respondents.

GENERAL SERVICES CUSTOMER GROUP, et al., Petitioners,

v.

Rayburn HANZLIK, Administrator, Economic Regulatory Administration and Donald Paul Hodel, Secretary, United States Department of Energy, Respondents,

Lachmar, Indiana Gas Company, Inc., Trunkline LNG Company, Association of Businesses Advocating Tariff Equity, Intervenors.

TRUNKLINE LNG COMPANY, Petitioner,

v.

Rayburn HANZLIK, Administrator, Economic Regulatory Administration and Donald Paul Hodel, Secretary, United States Department of Energy, Respondents,

Lacmar, General Service Customer Group, et al., Indiana Gas Company, Inc., Intervenors.

Nos. 84–1651 to 84–1653.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 26, 1985.

Decided Dec. 20, 1985.

Raymond N. Shibley, with whom Michael F. McBride, Washington, D.C., was on brief for Trunkline LNG Co., petitioner in No. 84–1653 and intervenor in No. 84–1652.

W. Warfield Ross, with whom Toni K. Allen, Daniel L. Koffsky, John R. Schaefgen, Jr., Stephen L. Huntoon, Edward J. Grenier, Richard P. Noland, Robert W. Clark, III, Washington, D.C., Louis J. Caruso, Don L. Keskey, R. Philip Brown, Lansing, Mich., Jeffrey M. Petrash, James H. Holt, Washington, D.C., Thomas J. Russell, James Weging, Chicago, Ill., and Donald A. Low, Topeka, Kan., were on joint brief for Consumers Power Co., et al., petitioners in Nos. 84–1651 and 85–1652.

Thomas H. Kemp, Washington, D.C., with whom Catherine C. Cook and Merrill F. Hathaway, Washington, D.C., were on brief for respondents in Nos. 84–1651, 84–1652 and 84–1653.

Mary Baluss, with whom Alan Steele-Nicholson, Washington, D.C., was on brief for Lachmar, intervenor in Nos. 84–1652 and 84–1653. George B. Mickum, III and Edmund W. Burke, Washington, D.C., also entered appearances for Lachmar in Nos. 84–1652 and 84–1653.

J. Richard Tiano, Washington, D.C., and Daniel W. McGill, Indianapolis, Ind., entered appearances for Indiana Gas Co., intervenor in Nos. 84–1652 and 84–1653.

Before GINSBURG, SCALIA and STARR, Circuit Judges.

Opinion for the Court filed by Circuit Judge STARR.

STARR, Circuit Judge.

Not so long ago, this Nation was in the throes of an acute shortage of natural gas. The shortages of the past decade, spawning such litigation-generating measures as curtailment plans, have since given way to the surpluses of the present decade. It is in this rapid transformation of the energy landscape that this case had its genesis.

With the onset of natural gas shortages, Trunkline Gas Company and Trunkline LNG Company (together referred to as "Trunkline"), sought federal regulatory approval in 1973 of an ambitious project to import liquified natural gas (LNG) from Algeria. Calling for a twenty-year period of importation of Algerian LNG purchased from a state-owned corporation, Sonatrach, the applications were eventually approved without condition in 1977 by the Federal Power Commission pursuant to section 3 of the Natural Gas Act, 15 U.S.C. § 717b (1982). Due to various delays, almost a decade passed before Trunkline announced in August 1982 that LNG loadings would begin. As fate would have it, this long-an-

ticipated event brought forth a storm of complaints, petitions, and protests filed with the FPC's successors, the Federal Energy Regulatory Commission and the Economic Regulatory Administration (ERA). While in its formative stages the LNG project had been supported—or at least not opposed—by Trunkline's customers, the intervening years had seen a dramatic increase in price of the Algerian LNG. The complainants—Midwestern customers of Trunkline—sought from the ERA either a revocation or suspension of Trunkline's authorization to import Algerian LNG.

FERC and ERA set the complaints for hearing, presided over by FERC's Chief Administrative Law Judge. After taking evidence in the closing months of 1982, the ALJ rendered his decision in January 1983.[1] In brief, the ALJ concluded that ERA was without statutory authority to revoke or suspend an unconditional authorization under section 3 where no violation of the terms and conditions of the authorization had been alleged or established. The ALJ further concluded that, assuming *arguendo* the existence of such statutory authority, the facts of this case did not warrant revocation or suspension of Trunkline's import authorization.

In the first of two decisions now under challenge, the ERA Administrator concluded in Opinion and Order No. 50, J.A. at 971, (1) that the agency did in fact enjoy authority under section 3 to revoke or suspend an import authorization (even where the licen-

see was in compliance with the terms of the authorization) but that the requisite showing of "compelling and extraordinary circumstances" had not been made in this case, *id.* at 986; and (2) that any decision as to the reasonableness of the price and related pricing provisions would be deferred for at least six months, when market conditions and unfolding developments on Capitol Hill could be better assessed.[2]

Following this decision, with numerous petitions for rehearing pending before the Administrator, Trunkline filed a proposed amendment to its import contract with Sonatrach. Styled Amendment No. 1, the modification, if approved by both U.S. and Algerian authorities, would reduce both the amount of LNG that Trunkline is required to take at present and the price of the LNG for several years of the 20-year agreement. As market conditions changed, however, Trunkline unilaterally suspended purchases from Sonatrach in December 1983, contending that the high cost of Algerian LNG had rendered the gas unmarketable. In setting forth its reasons for this suspension before the agency, Trunkline stated that it "could no longer purchase LNG ... [because] further purchases would threaten [its] economic viability."[3] Thus, before ERA had acted on Amendment No. 1, Trunkline at its own instance suspended all purchases from Sonatrach indefinitely, resulting in the institution of arbitration proceedings in both Geneva and London.

---

**1.** The decision was of no legal consequence for purposes of this proceeding, inasmuch as the ALJ's mission was simply to compile a record for the Administrator of ERA. The ALJ's determination did serve as an initial decision of the Federal Energy Regulatory Commission.

**2.** In the course of his decision, the Administrator reached the following conclusions: (1) Although a gas surplus exists nationally on the Trunkline system, Trunkline will need additional supplies of gas within 3 to 4 years, depending upon the success of Trunkline's domestic supply acquisitions, J.A. at 990; (2) that "the record does not support a conclusion that Algeria is an unreliable supplier under [the Trunkline] contract," although Algeria's record with respect to other contracts and trading partners "has been mixed," *id.* at 999; and (3) that Trunkline's

project will have a slight adverse impact on the U.S. balance of payments, *id.* at 1001.

**3.** In the specific corporate setting before us, Trunkline Gas Company notified its supplier of LNG, Trunkline LNG Company, that it could no longer take Algerian LNG. Trunkline LNG Company thereupon notified Sonatrach and a U.S. shipping company (Lachmar) that owned three large, cryogenic LNG vessels of an indefinite suspension of LNG purchases and transportation effective December 12, 1983. In the words of the ERA Administrator, Trunkline LNG Company "cited certain events and the effect of Trunkline [Gas Company's] action as constituting a *force majeure,* as Trunkline [Gas Company] was [Trunkline LNG Co.'s] sole customer and source of revenue." J.A. at 1432 (citation omitted).

In March 1984, with the project thus suspended, the ERA Administrator issued the second opinion under challenge here, Opinion and Order No. 50–A. In that five-page order, the Administrator dismissed all complaints and petitions, as well as Trunkline's application for approval of Amendment No. 1. Observing that Trunkline's "indefinite suspension of LNG imports fundamentally changes the facts and circumstances that were the primary basis of the complaints in this proceeding," the Administrator concluded that the various proceedings were "moot." J.A. at 1433. Either to continue the proceeding or to decide issues based upon an outdated record would be, the Administrator stated, "a theoretical exercise serving no useful purpose." *Id.* As the Administrator put it:

> At best, a determination made on the pending issues utilizing the record of this proceeding would constitute a hypothetical and advisory opinion. This would not serve the public interest.

*Id.* Accordingly, the complaints were dismissed "without prejudice to resubmission in the event that changes to the present circumstances make such action appropriate." *Id.* at 1434. Aware of Trunkline's on-going discussions with Sonatrach, the Administrator observed that any revised import arrangement would require Trunkline to seek to amend its section 3 authorization, thus requiring ERA approval. Moreover, in the event that shipments were contemplated under Trunkline's *existing* authorization, the Administrator directed that 90 days' advance notice of any such action be given, which in turn would lead to public notice designed "to provide interested persons the opportunity to raise relevant issues." *Id.*

Confronting another round of applications for rehearing, the Administrator entered an order on May 7, 1984, denying relief to all parties. As to Trunkline's desire for approval of Amendment No. 1, the Administrator concluded:

> [S]o long as the import is suspended and there is no proposal for its resumption, no practical purpose would be served by continuing the proceeding on [Trunkline's] application to amend its authorization. Granting the amendment would neither resolve the factors that led to the suspension nor clearly affect [Trunkline's] potential liabilities to Sonatrach. * * * * In this context, the application for amendment is not a live proposal for importing gas, and it is within the agency's discretion to dismiss it without prejudice to resubmission.

*Id.* at 1461.

In their petitions for review before us, Trunkline's customers and Trunkline itself join forces in attacking the Administrator's dismissal of the various proceedings. Drawing upon constitutionally based decisions as to the existence *vel non* of judicial power under Article III of the Constitution, the Joint Petitioners strenuously argue that this case is not moot as long as Trunkline's 1977 authorization under section 3 remains intact. Joint Petitioners' Brief at 24. So too, Trunkline contends that its application to secure ERA's approval of Amendment No. 1 is not moot, inasmuch as regulatory approval of that modification would reduce Trunkline's liability (now at issue before arbitrators) for past obligations (both in the quantity and price of gas taken from Sonatrach) and, correspondingly, Trunkline's future take-or-pay obligations to Sonatrach.

We agree that the proceedings before the Administrator were not moot in the constitutional sense of vitiating a live "case or controversy," which is of course the bedrock requirement of Article III for the exercise of judicial power.[4] But constitutionally-based mootness is not the issue here, for the simple reason that administrative agencies are not creatures of Article III. The precise question is, rather, whether the Administrator could, in the exercise

---

**4.** Without plumbing the depths of the law of mootness, we simply note by way of example that Trunkline continues to enjoy its section 3 authorization (albeit subject to the 90-day ad-vance notice requirement imposed by Opinion and Order No. 50–A) in the face of the Joint Petitioners' assault on that authorization as incompatible with the public interest.

of discretion, refrain from resolving issues in an administrative proceeding where the underlying project has been shelved, at least for the time being. We do not hesitate in concluding that he can do so, and that the exercise of discretion here was neither arbitrary nor capricious under section 10(e) of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A) (1982); nor did the deferral of decision cause the agency's action to be "unreasonably delayed" under the Act, *see id.* § 706(1).[5]

It is too well-established to be seriously questioned that agencies are empowered to order their own proceedings and control their own dockets.[6] At bottom, that is what occurred here. The Administrator has chosen not to decide questions that the Joint Petitioners themselves see as critical—questions pertaining to the reasonableness of the price that Trunkline's customers will hereafter pay for Algerian LNG. But the short answer to petitioners' request is that no one knows if Trunkline will ever again purchase Algerian LNG. Even if LNG imports are sought to be renewed in the future, it is unknown what price will be proposed for that commodity. As we have seen, the Administrator contemplates that new amendments will have to be filed by Trunkline before any change to the current import authorization will be permitted. The price may be higher than that provided under the present authorization, or it may be lower. We do not know, but more importantly, the Administrator does not know and indeed cannot know until such time, if at all, that Trunkline-Sonatrach negotiations (or the ongoing arbitration proceedings) result in a concrete, tangible proposal. So too, if Trunkline seeks to import LNG under its current authorization, the Administrator has provided for advance public notice of any such action. The Administrator's ultimate action would presumably take into account the then current market conditions, which will of course not necessarily be the same as those reflected in an administrative record that is already three years old.

Joint Petitioners nonetheless argue vehemently that the Administrator must go forward with their revocation proceedings. As they see it, the Administrator is duty bound to protect the public interest which, in their view, can only be vindicated by revoking or suspending a billion-dollar project which some of their number once supported. But this argument proves too much. The ERA manifestly does not have an ironclad obligation to opine on any public-interest issue that parties may invite it to address. We are at a loss to divine any statutory or regulatory requirement im-

5. In so holding, we in no wise uphold the agency's action on a ground other than that articulated by the agency itself. *Compare SEC v. Chenery Corp.,* 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947). To be sure, the Administrator employed the term "moot" in dismissing these petitions and applications. But it is manifest that the Administrator was not invoking "mootness" in the sense of the Article III judicial power; that is to say, the Administrator emphatically did not hold that he was without power to go forward in these proceedings. Not only did he not invoke the various decisional authorities on mootness now relied on by all parties in this court, but he reasserted his authority over these various proceedings by, among other things, requiring Trunkline to provide 90 days' notice before resuming importation of LNG. Rather, the Administrator was using the term "moot" in its ordinary sense of "hypothetical." We read the Administrator's decision, then, as a simple exercise of administrative discretion, in which the Administrator held that it would not be in the public interest to address a set of hypothetical, abstract issues when it was uncertain whether this project would ever be revived.

6. *See, e.g., Vermont Yankee Nuclear Power Corp. v. NRDC,* 435 U.S. 519, 543–44, 98 S.Ct. 1197, 1211, 55 L.Ed.2d 460 (1978) ("administrative agencies 'should be free to fashion their own rules of procedure and to pursue methods of inquiry capable of permitting them to discharge their multitudinous duties.'") (quoting *FCC v. Schreiber,* 381 U.S. 279, 290, 85 S.Ct. 1459, 1467, 14 L.Ed.2d 383 (1965) and *FCC v. Pottsville Broadcasting Co.,* 309 U.S. 134, 143, 60 S.Ct. 437, 441, 84 L.Ed. 656 (1940)); *FCC v. WJR, The Goodwill Station, Inc.,* 337 U.S. 265, 272, 69 S.Ct. 1097, 1101, 93 L.Ed. 1353 (1949) (docket management a matter for agency discretion); *Natural Resources Defense Council, Inc. v. SEC,* 606 F.2d 1031, 1056 (D.C.Cir.1979) ("An agency is allowed to be master of its own house, lest effective agency decisionmaking not occur in *any* proceeding ...") (emphasis in original).

posed upon ERA either to sound the death knell for or breathe life back into a project which has been placed in mothballs by its U.S. architects. The Administrator's declination to press forward with these proceedings, in our view, is neither arbitrary, capricious nor an abuse of discretion under 5 U.S.C. § 706(2)(A). This is especially so where the one factor which the Joint Petitioners herald as the *sine qua non* of the project's consistency *vel non* with the public interest—the price of any Algerian LNG which might be imported by Trunkline—is not even known because no purchases are being made. Indeed, not a bit of Algerian LNG has found its way into Trunkline's system for two years. Under these circumstances, we cannot embrace the Joint Petitioners' extravagant notion that the courts are properly within their province to order the Administrator to decide an issue where the agency has seen fit to adjourn, for specific, express reasons, to a more propitious occasion.

We reach the same conclusion as to Trunkline's push for approval of its Amendment No. 1. As Trunkline sees it, ERA's approval of that amendment would have a salubrious effect in the arbitration proceedings now going on in Europe. But the hard fact remains that although Amendment No. 1 was crafted to govern the importation of Algerian LNG, at this juncture Trunkline is not seeking to import a single cubic foot of LNG from Sonatrach. The Administrator was thus correct in concluding that Trunkline's application is *"[i]n this context ...* not a live proposal for importing gas." J.A. at 1461 (emphasis added). We know of nothing that would *require* an Administrator to act upon an application merely because it might have happy consequences for a regulated entity's arbitration position with a foreign supplier.

For the reasons stated, we conclude that the Administrator acted within his discretion in dismissing these proceedings without prejudice to resubmission of the various petitions and applications. We thus have no occasion to address any of the substantive conclusions set forth in Opinion and Order No. 50;[7] instead, we hold more narrowly that Opinion and Order No. 50–A was lawful under the circumstances of a project that has departed the realm of operation and entered the forum of arbitration and negotiation. The petitions for review are therefore

*Denied.*

---

**7.** In particular, we do not address the nettlesome issue whether the ERA does indeed have authority to revoke a section 3 authorization, pursuant to which approximately $1 billion was invested in U.S. facilities alone, in the absence of a violation of the terms of the authorization.