921 F.2d 313
 287 U.S.App.D.C. 273, 122 P.U.R.4th 219
 TRUNKLINE LNG COMPANY, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Indiana Gas Company, Inc., Panhandle Customer Group,
Consumers Power Company, Michigan Consolidated Gas
Company, Mississippi River Transmission
Corporation, Intervenors.
PANHANDLE CUSTOMER GROUP, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Michigan Consolidated Gas Company, Trunkline LNG Company,
Indiana Gas Company, Inc., Citizens Gas & Coke
Utility, Mississippi River Transmission
Corporation, Intervenors.
 Nos. 89-1492, 89-1610.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Oct. 5, 1990.
Decided Dec. 14, 1990.
 
 Raymond N. Shibley, with whom Michael F. McBride, Bruce W. Neely, and M.E. Remmenga were on the brief, for Trunkline LNG Co., petitioner in 89-1492 and intervenor in 89-1610.
 John R. Schaefgen, Jr., with whom Stephen L. Huntoon and Randall V. Griffin were on the brief, for Panhandle Customer Group, petitioner in 89-1610 and intervenor in 89-1492. Richard M. Merriman also entered an appearance.
 Joel M. Cockrell, Atty., Federal Energy Regulatory Com'n, with whom William S. Scherman, General Counsel, and Joseph S. Davies, Deputy Sol., were on the brief, for respondent in 89-1492 and 89-1610. Jill Hall, Atty., Federal Energy Regulatory Com'n, also entered an appearance.
 William M. Lange and Mona M. Janopaul were on the brief, for intervenor Consumers Power Co. in 89-1492.
 Tom Rattray and Ronald E. Christian entered appearances, for intervenor Indiana Gas Co., Inc. in 89-1492 and 89-1610.
 Jeffrey M. Petrash entered an appearance, for intervenor Michigan Consol. Gas Co. in 89-1492 and 89-1610.
 John B. Rudolph, Vera Callahan Neinast, and Juanita Feigenbaum entered appearances, for intervenor Mississippi River Transmission Corp. in 89-1492 and 89-1610.
 William P. Diener and Steven M. Sherman entered appearances, for intervenor Citizens Gas & Coke Utility in 89-1610.
 Before SILBERMAN, HENDERSON, and RANDOLPH,* Circuit Judges.
 Opinion for the Court filed PER CURIAM.
 
 PER CURIAM:
 
 1
 In these consolidated cases, petitioners seek review of different aspects of two orders issued by the Federal Energy Regulatory Commission ("FERC"). Petitioner Panhandle Customer Group--an assemblage of natural gas distribution companies--challenges FERC's decision not to rule on the prudence of Trunkline LNG's acceptance of an amendment to a contract for importation of liquified natural gas ("LNG"). The amendment escalated the price paid for the gas. We remand this issue to FERC for further consideration. Petitioner Trunkline LNG Company seeks review of FERC's resolution of various accounting issues. We deny this petition.
 
 I.
 
 2
 We have described the gas importation project involved in these cases in a previous encounter with this subject matter, see Association of Businesses Advocating Tariff Equity v. Hanzlik, 779 F.2d 697 (D.C.Cir.1985) ("ABATE "), and accordingly will limit our discussion of it here. In 1973, Trunkline agreed to import LNG from a state-owned Algerian gas company. It then began constructing a facility in Lake Charles, Louisiana at which to unload the LNG, to convert it back into a gas, to store it, and ultimately to transport it to its sole purchaser. The Federal Power Commission ("FPC"), the predecessor to FERC, approved the import arrangement as well as construction of the Lake Charles facility. 58 F.P.C. 726 (1977).
 
 
 3
 On August 7, 1981, Trunkline informed the Algerians that it was ready to receive gas shipments. The Algerians, in reply, claimed that construction problems at their facility prevented immediate delivery. Trunkline ultimately secured performance from the Algerians by agreeing to a contract amendment increasing the price it would pay for the imported gas (Amendment No. 1). The parties further agreed that Amendment No. 1 would not go into effect until they obtained regulatory approval of the contract modification. In the interim, the Algerians agreed to begin deliveries of gas under the terms of the original agreement. The first shipment arrived at the Lake Charles facility on September 25, 1982.
 
 
 4
 After Trunkline announced that it would commence deliveries of gas, distributors asked the Economic Regulatory Administration ("ERA") and FERC to suspend or revoke Trunkline's import authorization. The price of Algerian gas had risen dramatically since the mid-1970's, and the distributors wished to slip their obligation to purchase the Algerian gas from Trunkline. Trunkline subsequently filed applications with ERA and FERC for approval of Amendment No. 1. Both agencies declined to suspend or revoke Trunkline's import authorization. See ABATE, 779 F.2d at 699. While they were considering Amendment No. 1, however, Trunkline suspended deliveries from Algeria in December, 1983 under the force majeure clause of the contract because of the unmarketability of the gas. This caused FERC to transfer Trunkline's application to ERA, which in turn refused to review Amendment No. 1 because it considered the question to have been mooted by the suspension of the parties' contractual arrangement. See id. at 699-700. We affirmed this determination by ERA. See id. at 702.
 
 
 5
 The issues raised in this appeal stem from three separate matters which FERC ultimately consolidated for resolution. First, natural gas customers alleged (in the context of an application for a rate increase filed by Trunkline before it suspended imports) that Trunkline's acceptance of Amendment No. 1 was imprudent. Second, the FERC staff conducted an audit of the cost of constructing the Lake Charles facility and proposed correcting entries that reduced Trunkline's rate base. Trunkline objected to several of these correcting entries. Third, the FERC staff contended that certain shipping payments made by Trunkline to Lachmar Shipping, a 40 percent affiliate of Trunkline, were not prudent and therefore should not be part of the rate base. FERC ordered a hearing on these matters.
 
 
 6
 The ALJ ruled in Trunkline's favor on the prudence of accepting Amendment No. 1, on many (but not all) of the correcting entries, and on the shipping costs. 38 FERC p 63,022 (Feb. 17, 1987) ("ALJ Opinion "). On review, FERC declined to exercise jurisdiction over the issue of the prudence of Amendment No. 1 and ruled against Trunkline on all of the correcting entries and on the shipping costs. 45 FERC p 61,256 (Nov. 22, 1988). FERC denied all requests for reconsideration. 48 FERC p 61,182 (Aug. 2, 1989) ("Reconsideration Order "). Panhandle and Trunkline have petitioned for review of these FERC orders.
 
 II.
 
 7
 Panhandle challenges FERC's decision that it does not have jurisdiction to assess the prudence of Amendment No. 1. FERC now agrees that its rationale for its finding that it lacked jurisdiction was erroneous and asks us to remand the prudence issue to it for further consideration. Trunkline nevertheless contends, on grounds different from those relied on below by FERC, that FERC has no jurisdiction over this issue and that a remand is consequently inappropriate. We believe that FERC should have the first word concerning its jurisdiction and accordingly grant its request for a remand.
 
 
 8
 As we have recently explained in detail, jurisdiction over the regulation of imported natural gas is controlled by the Secretary of Energy, who is free to delegate responsibilities in this area to FERC, to ERA, or to other officers or employees of the Department of Energy. See TransCanada Pipelines Ltd. v. FERC, 878 F.2d 401, 405-06 (D.C.Cir.1989). In guidelines issued in 1984, the Secretary granted ERA the authority under Sec. 3 of the Natural Gas Act to determine whether to permit importation of natural gas as consistent with the public interest and FERC the authority under Secs. 4, 5, and 7 of the Act to regulate the rates charged for imported gas. See id. at 405. The guidelines, however, limit FERC's ratemaking jurisdiction to regulation "consistent[ ] with the determinations made by the [ERA] Administrator and the policy considerations reflected in the [ERA] authorization." See id. (quotation omitted).[1]
 
 
 9
 Trunkline's principal argument focuses on this limitation. It contends that ERA already implicitly determined the prudence of Amendment No. 1 by refusing to revoke Trunkline's import authorization and that any FERC reevaluation of the matter would be inconsistent with that determination and consequently beyond FERC's jurisdiction.
 
 
 10
 In our view, Trunkline has presented nothing that would justify departure from the well-settled rule that agencies are generally to be given the first word in determining whether a matter falls within their jurisdiction, see, e.g., Federal Power Comm'n v. Louisiana Power & Light Co., 406 U.S. 621, 647, 92 S.Ct. 1827, 1842, 32 L.Ed.2d 369 (1972); Myers v. Bethlehem Shipbuilding Corp., 303 U.S. 41, 50-51, 58 S.Ct. 459, 463-464, 82 L.Ed. 638 (1938). True, in TransCanada, upon which Trunkline heavily relies, we affirmed a FERC ruling that it lacked jurisdiction to assess for ratemaking purposes the prudence of an importation decision because ERA necessarily resolved that question (or one very similar to it) when it originally authorized the importation as consistent with the public interest. See 878 F.2d at 407. But we have no confidence here--without hearing first from FERC--that ERA similarly implicitly declared Amendment No. 1 to be prudent when it refused to revoke Trunkline's import authorization. Indeed, it appears that ERA requires a higher showing from consumers seeking to revoke authorizations than from gas companies applying for them in the first place, see ABATE, 779 F.2d at 699, and thus it may well be that ERA would refuse to revoke an authorization even though a company's decision to continue imports was imprudent. FERC is entitled to sort this matter out--at least initially.[2]
 
 III.
 
 11
 Trunkline seeks review of six FERC accounting rulings (on the correcting entries and the shipping costs) concerning the rate base Trunkline may employ in selling the imported gas. As Congress has delegated to FERC broad authority in rate-setting, requiring merely that the rates be "just and reasonable," 15 U.S.C. Sec. 717c, we play a severely limited role in reviewing a FERC ratemaking decision. We are not at liberty to mandate that FERC use "any single formula or combination of formulae in determining rates." Federal Power Comm'n v. Hope Gas Co., 320 U.S. 591, 602, 64 S.Ct. 281, 287, 88 L.Ed. 333 (1944). Instead, "[I]f the total effect of [a] rate order cannot be said to be unjust and unreasonable," the rate order is valid under the Natural Gas Act (and the Constitution). Id.; accord Permian Basin Area Rate Cases, 390 U.S. 747, 768, 88 S.Ct. 1344, 1360, 20 L.Ed.2d 312 (1968). The only question for us in that event is whether FERC has given reasonable explanations for its determinations--that no part of the order is "arbitrary, capricious, [or] an abuse of discretion" as the Administrative Procedure Act prohibits, 5 U.S.C. Sec. 706(2)(A).
 
 
 12
 Trunkline has made no showing--aside from several conclusional allegations in its brief--that the accounting rulings have resulted in an unjust and unreasonable rate base taken as a whole. Accordingly, we may ask only whether FERC has offered a reasonable explanation for each ruling. We conclude that it has.
 
 A.
 
 13
 FERC regulations provide that a utility may capitalize and include in its rate base the costs of financing construction (i.e., interest). 18 C.F.R. Sec. 154.63(f). This is known as an allowance for funds used during construction, or AFUDC. A FERC accounting release, however, requires that the utility stop capitalizing the interest as AFUDC "when the facilities have been tested and are placed in or ready for service." FERC STAT. & REG. p 40,005, at 40,009 (Accounting Release AR-5).
 
 
 14
 Trunkline argued before FERC that it should be permitted to capitalize the interest on construction financing of the Lake Charles facility until October 15, 1982, shortly after the first shipments of imported gas arrived at the facility. ALJ Opinion, 38 FERC p 63,022, at 65,132. FERC found that the Lake Charles facility was ready for service on August 7, 1981, although it was not tested or placed into service until October 15, 1982. 45 FERC p 61,256, at 61,779. It then held that, under Accounting Release AR-5, Trunkline could include as AFUDC only interest costs incurred by October 6, 1981, the time at which the facility was ready for service plus 60 days imputed as a reasonable testing period. Id.
 
 
 15
 Trunkline makes two basic arguments on appeal. It maintains first that FERC misapplied Accounting Release AR-5, both because the Lake Charles facility, in its view, is part of a unitary gas importation project which was not "ready for service" until the Algerians began supplying gas in late 1982 and because the Lake Charles facility, by FERC's own admission, was not "tested" until that time. Alternatively, Trunkline contends that the Lake Charles facility itself was not ready for service, as FERC found, in August of 1981. We reject both arguments.
 
 
 16
 FERC reasonably concluded that Trunkline's contentions concerning Accounting Release AR-5 essentially raised the question whether the original import authorization had imposed on Trunkline the risk of project delay due to non-performance by the Algerians, 45 FERC p 61,256, at 61,778. If the authorization did so, the costs associated with the delay should be borne by Trunkline even if the Lake Charles facility was part of a unitary project delayed by a breach beyond Trunkline's control, and it would accordingly be rational to prevent inclusion in the rate base of AFUDC incurred after the project would have been ready to proceed but for the Algerians' default. And under that hypothesis, it would be entirely reasonable for FERC to refuse to enforce the literal terms of Accounting Release AR-5, which would permit inclusion in the rate base of AFUDC up until the time of the testing delayed solely by the non-delivery of the gas. As FERC explained, "it would be improper to apply the guideline literally" because it "clearly contemplates that performance testing will commence immediately after construction activity ceases." Id.
 
 
 17
 Although we might conclude otherwise were we reviewing the matter de novo, we defer to FERC's conclusion that the import authorization did in fact place the risk of project delay on Trunkline. The opinion authorizing the project noted that
 
 
 18
 [m]any of the factors in this LNG import undertaking will not be subject to Trunkline control, such as operation of [the Algerian state-owned gas company's] liquefation [sic] plant and the transportation of the LNG from the Algerian port.
 
 
 19
 .... [U]pon consideration of the unprecedented nature and inherent risks of this LNG import program, it is concluded that ... [Trunkline be allowed to receive] additional returns ... designed to account for the additional risk involved....
 
 
 20
 58 F.P.C. at 782. FERC reasonably read this ruling as granting Trunkline a higher rate of return in exchange for its assumption of the risk of Algerian non-performance. Trunkline argues that neither the quoted passage nor anything else in the import authorization opinion expressly placed the risk of project delay on it, and points to language in the opinion on rehearing of the import authorization question explicitly assigning it the risk of project failure, 58 F.P.C. 2935, 2946 (1977), as creating an inference that the silence on project delay meant that the costs of delay were to be borne by its customers. But in light of the increased rate of return awarded Trunkline and the stress in the import authorization opinion on the riskiness of the project, this inference--while possible--is not powerful enough to offset the substantial deference we are bound to give to FERC's interpretation of its own prior order. See, e.g., City of Angels Broadcasting, Inc. v. FCC, 745 F.2d 656, 661 (D.C.Cir.1984).
 
 
 21
 Finally, FERC's conclusion that the Lake Charles facility was "ready for service" in August, 1981 is supported by substantial evidence. Trunkline sent correspondence to Algeria indicating that the Lake Charles facility would be ready to receive deliveries as of August 7, 1981. J.A. 911; see also Reconsideration Order, 48 FERC p 61,182, at 61,669. FERC also referred to an admission by Trunkline that start-up after receipt of initial gas deliveries could have occurred three to six weeks after August 7. 45 FERC p 61,256, at 61,777.B.
 
 
 22
 In constructing the Lake Charles facility, Trunkline paid interest on construction loans and sales and use taxes on construction materials. At the time Trunkline incurred these costs (1977-1979), the Internal Revenue Code permitted natural gas companies either to deduct or to depreciate such expenses for tax accounting purposes. ALJ Opinion, 38 FERC p 63,022, at 65,136. Trunkline opted to deduct the tax and interest costs from an affiliated company's tax return. This decision to deduct rather than to depreciate had the effect of deferring taxes incurred during the construction period, which of course was favorable to Trunkline because it permitted Trunkline and its shareholders to use the money in the interim (a benefit termed the "time value" of deferred taxes). Deferral of taxes also had the effect of making Trunkline's later taxes--those paid during operation of the facility--higher than if it had spaced the tax benefit over time through depreciation. This, in turn, placed an additional burden on the ratepayers, who assume such costs in the prices they pay for natural gas.
 
 
 23
 The parties agree that the ratepayers are entitled to a reduction in the rate base by the amount of "deferred taxes," which represents the difference between the amount of taxes paid in a given year in which a deduction was taken and the amount of taxes that the company would have paid in that year if it instead elected to depreciate. The parties do not agree, however, on whether the rate base should also be reduced by the time value benefit of these deferred taxes. FERC held that the rate base should be so reduced, reasoning that as the ratepayers bear the burden of construction costs in the form of higher gas prices, they should receive the entire tax benefit resulting from construction. 45 FERC p 61,256, at 61,782.
 
 
 24
 Trunkline argues that this ruling was arbitrary and capricious because FERC awarded the time value of deferred taxes to shareholders in the one previous order squarely addressing this issue. See Northern Border Pipeline Company, 23 FERC p 61,213 (1983). In the ruling below, FERC distinguished Northern Border as a "sui generis " case requiring special regulatory treatment. 45 FERC p 61,256, at 61,782. Trunkline contends that this is an insufficient explanation.
 
 
 25
 An agency cannot typically abandon an earlier position simply by subsequently terming the case in which it was applied "sui generis," but is instead "obligated to supply a reasoned analysis for the change." Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Ins. Co., 463 U.S. 29, 42, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983). In this instance, however, we think FERC's explanation for not following its earlier ruling is adequate. In Northern Border, FERC indicated that it ordinarily would require companies to pass through to ratepayers the time value benefit of deferred taxes. 23 FERC p 61,213, at 61,441. It declined to apply the general policy in that case only because of a congressionally-recognized "need to facilitate financing of the [Alaska Natural Gas Transportation System]," expressly noting that it would "not require a reduction [of rate base] in this case" because of "the sui generis status of [the Alaska natural gas] project." Id. As FERC indicated its general pro-ratepayer inclination on this question in the previous opinion and specifically confined its decision in that case to special limiting factors, we believe that FERC did not thereby establish a new general policy of awarding the time value to shareholders.
 
 C.
 
 26
 Expenses of a business generally become due before payment for services rendered are received, and reserves therefore must be kept at hand (and remained unused) to meet these expenses. To permit a gas company to recover the lost opportunity cost of this idle capital, the Natural Gas Act allows it to include in its rate base "a cash allowance to permit it to meet current obligations as they arise." Boroughs of Ellwood City v. FERC, 731 F.2d 959, 963 (D.C.Cir.1984). This cash allowance is termed "cash working capital."In order to determine how much capital a company is forced to reserve, and thus to calculate the amount of cash working capital the company may include in its rate base, FERC performs a "lead-lag" study. This study has two parts: it "measures the differences in the time frames between (1) the time services are rendered until the revenues for that service are received [the revenue lag] and (2) the time that labor, materials, etc., used in providing services are incurred and recorded until they are paid for [the expense lag]." ACCOUNTING FOR PUBLIC UTILITIES Sec. 5.06 (1989). If its revenue lag exceeds its expense lag, a company will need to keep capital on hand--there will be a certain number of days where the company has to pay expenses incurred in providing a service but has not yet received payment from the customers who received the service. The amount of cash working capital added to rate base is a function of this number of days.
 
 
 27
 Trunkline and FERC first disagree on the number of days that should be considered in calculating the cash working capital allowance. They agree that Trunkline's revenue lag is 40.280 days, which represents the time between Trunkline's delivery of gas to its customer and the date that payment is due to it. They reach different conclusions, however, as to the expense lag enjoyed by Trunkline. Trunkline argued before FERC, and repeats here, that its expense lag was only 3.26 days, which represents the amount of time between Trunkline's delivery of gas to its customer and its payment to the Algerians for the gas. The FERC rejected this method of calculation as incorrectly focusing on the date of Trunkline's sale of gas to its customer as opposed to the date of its receipt of the gas; FERC instead thought that the expense lag calculation should be based on the difference between the date of Trunkline's receipt of the gas from the Algerians (the date on which Trunkline incurred the expense) and the date of its payment to them, an equation which yields an expense lag of 22.32 days. Reconsideration Order, 48 FERC p 61,182, at 61,677.
 
 
 28
 We think that FERC's view is plainly reasonable. As explained above, the entire reason for calculating the expense lag is to determine the number of days in which a company retains in its possession capital to which it ultimately has no right. This figure is then offset by the revenue lag--the number of days in which a company does not possess money to which it ultimately has a right--to determine whether, on net, the company has a need for idle cash and is entitled to a cash working capital addition to rate base. In light of this, FERC's decision to measure the expense lag in reference to the time between the date when a company incurs an expense (and presumably receives the corresponding benefit) and when it pays the expense seems manifestly rational.
 
 
 29
 Trunkline's argument appears to be that it derives no economic benefit from the gas until it passes the gas along to its customer because the intervening period between receipt from the Algerians and sale in the United States is simply used for shipping. It contends that this shipping period therefore is not properly part of the expense lag. This argument, however, is contradicted by the record, which shows that the gas becomes the property of Trunkline once it is loaded onto the tankers in the Mediterranean. J.A. 230 (contract of sale). It seems to us that having a property interest in gas confers some economic benefit on Trunkline at all times--Trunkline, for example, may use the gas as collateral or may sell the gas for immediate payment even while it is at sea. We therefore sustain FERC's decision on this point.[3]
 
 
 30
 FERC and Trunkline disagree on another lead-lag issue as well. FERC regulations permit a company to include in its rate base a return for non-liquid natural gas stored underground. ALJ Opinion, 38 FERC p 63,022, at 65,143. Based on this, Trunkline excluded from its lead-lag study and placed directly in the rate base the costs of storing gas necessary to maintain cryogenic (low temperature) conditions in the tanks.
 
 
 31
 The parties agreed that liquid natural gas which was maintained in storage tanks for cryogenic purposes "is analogous to the ... non-LNG stored underground" and therefore "includable in the rate base...." 45 FERC p 61,256, at 61,791. According to FERC, they also agreed that only stored gas necessary for cryogenic purposes could be included in the rate base. Id. The parties held different views, however, about how much gas was in fact needed to maintain cryogenic conditions. Trunkline argued that it was entitled to include in the rate base the average balance of gas continuously held in storage during a billing period. FERC noted that this average balance proved nothing about the amount of gas necessary to maintain cryogenic conditions and, as Trunkline submitted nothing showing the amount required for that purpose, held that Trunkline had failed to meet its burden of proving that any gas had to be held. Reconsideration Order, 48 FERC p 61,182, at 61,678. Accordingly, it required a refund to the ratepayers.
 
 
 32
 We again think FERC's conclusion reasonable. It fully explained why Trunkline's evidence on the average balance of gas continuously held in storage was not sufficient to show the amount of gas needed for cryogenic purposes: "[c]learly, the level of LNG in the storage tanks fluctuated. If the tanks could be safely operated with a quantum of [gas] less than the average volume on any given day, then it can hardly be said that the average (and, necessarily, higher) volume of [gas] was needed for cooling." Reconsideration Order, 48 FERC p 61,182, at 61,678.
 
 
 33
 Trunkline now argues that FERC misinterpreted its position. It maintains that its contention below was not simply that gas necessary to maintain cryogenic conditions should be included directly in the rate base, but rather that it is entitled to include the average balance of gas continuously held in storage for other necessary functions as well. The record, however, is not clear on the position taken by Trunkline below, and the briefs in this case certainly did not enlighten us in this regard. True, the ALJ may have cryptically implied that Trunkline believed that gas stored for cryogenic purposes was the strongest but not the only case for rate base treatment. ALJ Opinion, 38 FERC p 63,022, at 65,143. But Trunkline offers no evidence of its position below except for this unrevealing reference in the ALJ's initial decision.
 
 D.
 
 34
 In 1977, when the FPC approved construction of the Lake Charles facility and authorized gas imports from Algeria, it set Trunkline's straight-line rate of depreciation at 5 percent. 58 F.P.C. at 743. Trunkline asked FERC for a decrease in this rate. FERC declined to reach this request because Trunkline had not raised the issue before the ALJ, "thus improperly depriving opposing parties of a full opportunity to contest the issue." 45 FERC p 61,256, at 61,795. It accordingly held that Trunkline had to initiate a new proceeding to obtain a change in the depreciation rate. Id.
 
 
 35
 Trunkline argues that the Commission should have addressed its request. It asserts that FERC had a full record on which to make a decision and contends that, under Minneapolis Gas Co. v. Federal Power Comm'n, 294 F.2d 212 (D.C.Cir.1961), FERC therefore had to reach the depreciation issue. We disagree. In Minneapolis Gas, the FPC terminated a proceeding without rendering a decision even though it had set an issue for hearing, collected all evidence, and concluded the hearing itself. See id. at 215. Here, by contrast, a hearing was never held on the depreciation issue--Trunkline did not propose a change in its depreciation rate when it first filed a proposed tariff for review by the ALJ, when it presented its direct case, or when it introduced reply testimony. ALJ Opinion, 38 FERC p 63,022, at 65,144. FERC acted well within its broad discretion to structure its own proceedings in ruling that Trunkline could not under these circumstances obtain a change in its depreciation rate without unduly jeopardizing the opportunity of all interested parties to challenge Trunkline's proposals.
 
 E.
 
 36
 When it approved Trunkline's project in 1977, the FPC held that the prudence of Trunkline's shipping rates could be reviewed in future rate proceedings. The FPC explained that rates would be deemed prudent if the costs of shipping were "reasonable when considered in the context of the customs and practices of the shipping industry." 58 F.P.C. at 739.
 
 
 37
 Under the shipping contract between Trunkline and its 40 percent affiliate, Lachmar, shipping rates were a function of estimated or budgeted costs instead of actual costs. To reconcile these estimated costs with the actual cost of shipment, the contract annually adjusted shipping rates for the next year by the amount that Trunkline overpaid or underpaid in the previous year. In the year prior to the termination of imports due to the force majeure situation, Trunkline had paid Lachmar approximately $14.5 million more than actual shipping costs. As operations had ceased, Trunkline obviously could not obtain a refund in the form of lower costs the next year, and ratepayers absorbed this cost.
 
 
 38
 FERC ruled that Trunkline's payment of these costs was imprudent and that the ratepayers therefore should not be responsible for covering the $14.5 million loss. It held that Trunkline possessed the burden of producing evidence that this contractual arrangement was consistent with industry practice, reasoning that the presumption of management prudence was rebutted because Trunkline paid an affiliate for "costs" that Trunkline never incurred. 45 FERC p 61,256, at 61,803. It then determined that Trunkline had not carried this burden, as it "failed to allege or establish that payment by shipping consignees of contractual costs not actually incurred by providers of ocean transportation service is consistent with industry practice." Id.
 
 
 39
 Trunkline contends that FERC illegitimately focused on the unfortunate and unanticipated results of the contractual arrangement in this case rather than on whether that arrangement was consistent with industry practice. It argues that it conclusively demonstrated its prudence--as defined in the original FPC opinion--by showing that an arrangement basing payments on estimated rather than actual costs is typically (or even occasionally) employed in the industry, and it insists that FERC therefore had to allow its payment of the "costs" without regard to whether Lachmar actually earned them or to Trunkline's inability to obtain a refund in the succeeding year.
 
 
 40
 Again in light of our limited scope of review, we affirm FERC's ruling. FERC's opinion can be read as focusing not simply on the consequences of the contractual arrangement but on Trunkline's failure to ensure that some mechanism existed in the contractual arrangement by which it could recoup any overpayment in the previous year in the event the project collapsed, and then as holding Trunkline imprudent because it did not produce evidence that the absence of such a mechanism is consistent with industry practice.
 
 
 41
 FERC also explained its disallowance of the $14.6 million cost overpayment based upon a careful and reasonable reading the FPC's 1977 opinion. While the FPC stated that shipping charges should be reviewed with reference to industry practice, FERC pointed out that the FPC also limited recovery to "actually incurred and prudent expenses" and "necessary and proper charges." 45 FERC p 61,256, at 61,802-03. Based on this language, it was not unreasonable for the FERC to prevent Trunkline from recovering through the rate base payments which overestimated the financial burden.
 
 
 42
 * * * * * *
 
 
 43
 It may well be that FERC, by reversing the ALJ on many of the accounting issues, was really apportioning (roughly) the costs of this ill-fated transaction between the shareholders and the ratepayers--without deciding whether Trunkline's acceptance of Amendment No. 1 was prudent. But we have no firm basis in the record for concluding that, and we must afford FERC substantial deference on these sorts of issues. FERC's explanations for its positions are on their face reasonable, so we have no warrant to quarrel with this part of its decision.
 
 
 44
 Accordingly, we remand 89-1610 to FERC for proceedings not inconsistent with this opinion. We deny Trunkline's petition for review in 89-1492 and affirm the orders in that case issued by FERC.
 
 
 
 *
 Circuit Judge Randolph, who was a member of the panel at the time the case was argued, recused himself from the case after oral argument
 
 
 [1]
 The Secretary subsequently transferred ERA's authority to the Assistant Secretary for Fossil Energy; he did not, however, expand FERC's jurisdiction, and FERC accordingly may not now contradict any decision of the Assistant Secretary. See id. at 406
 
 
 [2]
 Trunkline also contends that FERC is barred from addressing the prudence issue because it decided previously that gas imported by Trunkline after the execution of Amendment No. 1 would be marketable and because the consumer groups failed directly to raise the issue in prior proceedings before it and ERA. We think it plain, however, that the issue and claim preclusive effects of prior FERC proceedings are matters which FERC should consider in the first instance, although it may well turn out that Panhandle's claims do run afoul of one or both of these doctrines
 
 
 [3]
 Of course, mere ownership of LNG in transit from Algeria does not necessarily confer upon Trunkline the full economic value of that LNG, so nothing we say should be taken to prejudice any possible claim by Trunkline that its rate base should include a component for the cost of the average volume of gas in transit from Algeria