# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued January 16, 2007           Decided July 24, 2007

No. 05-1426

INTERSTATE NATURAL GAS ASSOCIATION OF AMERICA,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

———

On Petition for Review of Orders of the
Federal Energy Regulatory Commission

———

*Andrea C. Wolfman* argued the cause for petitioner. With her on the briefs were *Joan Dreskin* and *Timm Abendroth*.

*Carol J. Banta*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With her on the brief were *John S. Moot*, General Counsel, and *Robert H. Solomon*, Solicitor.

Before: ROGERS, GARLAND and BROWN, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* BROWN.

BROWN, *Circuit Judge*: The Federal Energy Regulatory Commission ("FERC" or "the Commission") issued an Ac-

counting Order, instructing natural gas pipeline companies to expense certain costs associated with the Pipeline Safety Improvement Act of 2002, Pub. L. No. 107-355, 116 Stat. 2985 ("PSIA"). After FERC denied a request for rehearing, the Interstate Natural Gas Association of America ("INGAA") petitioned for review in this court. Finding FERC's explanation for its Accounting Order reasonable and its responses to INGAA's comments sufficient, we deny the petition.

I

Section 14 of PSIA, 49 U.S.C. § 60109(c)–(d), requires each operator of natural gas pipelines to adopt and implement a written integrity management program ("IMP") to monitor and reduce the risks associated with pipeline segments located in areas of high population density ("High Consequence Areas," or "HCAs"). Each IMP includes a testing regime with two components. First, companies are to conduct baseline integrity assessments of their HCA segments by December 2012. *Id.* § 60109(c)(3)(A). Second, going forward, they are to retest each HCA segment at least once every seven years unless granted a waiver by the Secretary of Transportation. *Id.* § 60109(c)(3)(B), (5).

Under the Natural Gas Act, FERC has jurisdiction to regulate the transportation and sale of natural gas in interstate commerce. 15 U.S.C. § 717(a)–(b). This includes the power to issue rules and regulations governing pipeline companies' accounting practices. *Id.* §§ 717g(a), 717o. Pursuant to that authority, FERC issued a Notice of Proposed Accounting Release ("PAR") describing its planned accounting rules for PSIA testing and inviting comments. 69 Fed. Reg. 67,727 (Nov. 5, 2004). Under the proposal, testing costs under PSIA would be expensed, not capitalized.

The PAR acknowledged FERC had occasionally permitted capitalization of testing costs in the past, citing in particular *Northwest Pipeline Corp.*, Docket No. AC94-149-000 (FERC Apr. 30, 1996) ("*NPC*"). FERC distinguished *NPC* on the ground that NPC's testing costs were incurred "in connection with [a] major pipeline rehabilitation project[] involving significant replacements and modifications of facilities" that "extended the overall pipeline system's useful life and serviceability," while PSIA required testing as part of "on-going maintenance programs."

INGAA advocated capitalization of testing costs in comments submitted in response to the PAR. FERC subsequently issued an Accounting Order, 111 F.E.R.C. ¶ 61,501 (June 30, 2005), responding to comments and establishing definitive IMP accounting rules for pipeline companies. The Order repeated FERC's earlier instruction to expense PSIA testing costs and also set accounting rules for other IMP obligations. These rules were to take effect on January 1, 2006, with no restrictions placed on the accounting treatment of earlier expenditures.

The Accounting Order instructed pipeline companies to expense the costs of writing IMP implementation plans, identifying HCA segments, and conducting tests under PSIA, as well as certain "costs incurred to develop and maintain a record-keeping system to document [IMP] implementation and actions." INGAA petitioned for rehearing, arguing IMP start-up costs and data integration costs should be capitalized, as they are not recurring costs. FERC denied this petition in a Rehearing Order, 112 F.E.R.C. ¶ 61,309 (Sept. 19, 2005), and INGAA sought judicial review.

4

II

To establish standing as an association, INGAA must show (1) at least one of its members has standing in its own right, (2) the interests INGAA seeks to protect are germane to its purpose, and (3) neither the claim asserted nor the relief requested requires the participation of an individual INGAA member in the suit. *Am. Library Ass'n v. FCC*, 401 F.3d 489, 492 (D.C. Cir. 2005). Only the first of these requirements is in question.

Individual pipeline companies (which constitute INGAA's membership) are harmed by the Accounting Order's expensing requirements in at least two ways. First, expensing these costs rather than capitalizing them reduces the companies' "rate bases," thereby decreasing their maximum allowable revenues. *See Williston Basin Interstate Pipeline Co. v. FERC*, 165 F.3d 54, 56–57 (D.C. Cir. 1999); *Boston Edison Co. v. FERC*, 885 F.2d 962, 964 (1st Cir. 1989). Second, capitalized expenditures can be recovered through rate increases as the capital account depreciates, while expenses might be unrecoverable if deemed nonrecurring. Because we find the harm to INGAA members sufficient for standing purposes, INGAA has standing.

We review FERC's actions under 15 U.S.C. § 717r(b). *See CNG Transmission Corp. v. FERC*, 40 F.3d 1289, 1292–93 (D.C. Cir. 1994) (confirming that accounting orders satisfy § 717r(b)'s "aggrievement" condition). However, we may not consider an objection not "urged before the Commission in the application for rehearing unless there is reasonable ground for failure so to do." 15 U.S.C. § 717r(b). Factual findings by FERC are conclusive if supported by substantial evidence, *id.*, and barring constitutional concerns not at issue here, FERC is "free to fashion individual accounting rules" as long as they are not arbitrary or capricious. *Anaheim v. FERC*, 669 F.2d 799, 806 (D.C. Cir. 1981) (internal quotation marks omitted); *see*

*also* 5 U.S.C. § 706(2); *Sithe/Independence Power Partners v. FERC*, 165 F.3d 944, 948 (D.C. Cir. 1999).

On the merits, INGAA suggests two grounds on which we should set aside the Accounting Order. We address these in turn.

A

First, INGAA contends FERC deviated from its precedent in *NPC* without providing a reasoned explanation. *See Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 57 (1983); *Williams Gas Processing – Gulf Coast Co. v. FERC*, 373 F.3d 1335, 1341 (D.C. Cir. 2004).

FERC interpreted *NPC* as permitting capitalization of testing that (1) "was done in connection with major pipeline rehabilitation projects involving significant replacements and modifications of facilities"; (2) "extended the overall pipeline system's useful life and serviceability" or otherwise benefited future accounting periods; and (3) was not "associated with any on-going maintenance programs." This is a reasonable reading of *NPC*'s terse ruling, and we defer to it. *See Williams Gas Processing*, 373 F.3d at 1341.

Later, in the Accounting Order, FERC found *NPC* did not cover PSIA testing, as such testing "does not by itself increase the useful life of a pipeline asset or improve its efficiency," and the "primary aim" of the IMPs was "not to increase the capacity or efficiency of the pipeline" but to "maintain the integrity of the pipeline." As these comments reasonably respond to and negate all three prongs of the *NPC* test, we reject INGAA's first argument.

B

Second, INGAA argues FERC failed to respond reasonably to its comments on the PAR and the Accounting Order. When FERC issues accounting rules pursuant to 15 U.S.C. §§ 717g and 717o, it must abide by the Administrative Procedure Act ("APA") strictures at 5 U.S.C. § 553. *Mobil Oil Corp. v. FPC*, 469 F.2d 130, 139 (D.C. Cir. 1972); *Pub. Serv. Comm'n v. FPC*, 467 F.2d 361, 366 (D.C. Cir. 1972); *accord Texaco, Inc. v. FPC*, 412 F.2d 740, 745 (3d Cir. 1969). These include the duty to "give reasoned responses to all significant comments in a rulemaking proceeding." *Int'l Fabricare Inst. v. U.S. EPA*, 972 F.2d 384, 389 (D.C. Cir. 1992) (per curiam) (internal quotation marks omitted). However, "comments must be significant enough to step over a threshold requirement of materiality before any lack of agency response or consideration becomes of concern," *Portland Cement Ass'n v. Ruckelshaus*, 486 F.2d 375, 394 (D.C. Cir. 1973), and "[t]he APA requirement of agency responsiveness to comments is subject to the common-sense rule that a response be necessary," *NRDC v. U.S. EPA*, 859 F.2d 156, 188 (D.C. Cir. 1988) (per curiam).

Assuming without deciding that FERC had the same obligation to respond to INGAA's arguments regarding the Accounting Order as it had with respect to comments it received on the original PAR, we find FERC responded sufficiently to all of INGAA's arguments from its petition for rehearing. *See* 15 U.S.C. § 717r(b) (limiting review to arguments raised on rehearing).

INGAA generally complains the Commission ignored its own regulations and departed from precedent without explanation. Examined closely, however, INGAA's complaint is more accurately that the Commission's interpretation of both regulations and precedent differed from INGAA's. For example,

INGAA argued Abstract No. 89-13 from the Emerging Issues Task Force of the Financial Accounting Standards Board ("EITF 89-13") provided the proper framework for setting IMP accounting rules. But, in FERC's view, EITF 90-8, *Capitalization of Costs to Treat Environmental Contamination*, more fully described which costs should be capitalized and which expensed. *See* Rehearing Order ¶ 14. Contrary to INGAA's analysis, FERC determined that under EITF 90-8, baseline assessment costs should be expensed, as they would not "increase or extend the life, capacity, safety, or efficiency of a pipeline beyond its original construction or acquisition state." *Id.*; *see* EITF 90-8 at 2. While such baseline assessments could arguably increase a pipeline's *certified* capacity, it was reasonable for FERC to read EITF 90-8 to require increases in *actual physical* capacity.

FERC likewise rejected INGAA's attempted analogy between PSIA testing costs and prepaid expenses, as the testing costs secured no future service or resource. Rehearing Order ¶ 10. Equally appropriate was FERC's response to INGAA's argument that costs required to avoid loss of an asset ought to be capitalized, a theory FERC noted would require capitalization of even ordinary maintenance costs. *Id.* And while INGAA's assertion that PSIA expenses should be recognized in periods in which their benefits are realized is not unreasonable, neither is FERC's determination that the posited future benefits are too speculative to warrant capital accounting. *Id.* ¶ 9.

INGAA argued the initial costs of constructing databases and composing IMP implementation plans would be incurred only once and ought therefore to be capitalized. However, by statute such projects were to be complete by January 1, 2006, and the Accounting Order did not apply to expenditures prior to that date. Thus, this comment was not "significant," and FERC had no duty to respond to it. *See Portland Cement Ass'n*, 486

F.2d at 394.

INGAA also maintained *NPC* controlled.  As described above, FERC reasonably distinguished the rule from *NPC*.  *See* Accounting Order ¶¶ 21–22.

INGAA noted the PSIA regulations were contained in Subpart O of 49 C.F.R. Part 192 (§§ 192.901 *et seq.*), while pre-PSIA maintenance requirements appeared in Subpart M (§§ 192.701 *et seq.*).  From this, INGAA inferred the new regulations could not mandate maintenance expenditures, contrary to FERC's reasoning in the Accounting Order.  But we are aware of no authority making Subpart M the *sole* repository for maintenance regulations in Part 192, and as FERC reasonably argued, "an increase in the required level of maintenance does not change the fact that the work remains a maintenance activity," Rehearing Order ¶ 12.  We thus deem FERC's response sufficient.

Finally, INGAA argued early PSIA expenditures served to produce a "knowledge base" and improve "the original Integrity Plan 'asset,'" so they should be capitalized.  FERC again rejected INGAA's proposal, noting "[t]he activities incurred during the baseline period[] are not materially different, if different at all, from the same category of costs that INGAA does not object to expensing after the baseline period."  Rehearing Order ¶ 13.  In essence, INGAA wanted the first iteration of certain periodic expenditures to be deemed non-recurring precisely because they were first; FERC's response rejecting this theory was reasonable.

III

As described above, FERC provided a reasoned explanation for its decision not to treat *NPC* as governing, and it responded

9

sufficiently to all of INGAA's arguments.  Therefore, INGAA's petition for review is

*Denied.*